**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AIDA ACEVEDO**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-1224-KSM** |
| **CITY OF READING, et al.**, | |
| Defendants. | |

**MEMORANDUM**

MARSTON, J.                                                     April 5, 2024

     Aida Acevedo, the former human resources director for the City of Reading ("the City"), has sued the City, the current Mayor of Reading Eddie Moran, and his former special assistant, Nathanael ("Nate") Rivera, regarding the sexual harassment she endured at the hands of Rivera during her tenure at City Hall.  (Doc. No. 1.)  She brings claims against the City for hostile work environment and retaliation under both Title VII and the Pennsylvania Human Relations Act ("PHRA") and claims against Rivera and Mayor Moran in their individual capacities under 42 U.S.C. § 1983.  (*Id.*)  All Defendants have moved for summary judgment.  For the reasons set forth below the Court will grant the City and Mayor Moran's motion[1] with respect to the retaliation claim only and grant Rivera's motion in its entirety.

    **I.**       **Factual Background**

     Viewing the evidence in the light most favorable to Plaintiff, the relevant facts are as follows.

---

[1] Mayor Moran and the City filed a joint motion for summary judgment.  (Doc. No. 25.)  Rivera separately moved for summary judgment.  (Doc. No. 23.)

A. **Rivera and Plaintiff Meet and Plaintiff Begins Her Position with the City of Reading**

This case centers around sexual harassment Plaintiff endured at the hands of Mayor Moran's special assistant Defendant Nate Rivera.  Prior to becoming special assistant, Rivera actively worked on Moran's 2019 mayoral campaign.  (Doc. No. 38 at ¶ 9; Doc. No. 43 at ¶ 9.)  During this time, Plaintiff was introduced to Rivera at a real estate event in Reading that she attended with her friend, Elsie Maduro.[2]  (Doc. No. 35 ¶ 2.)  Maduro introduced Plaintiff to Rivera and explained he was a local realtor who was helping Moran with his mayoral campaign.  (*Id.*).  During their conversation, Rivera also informed Plaintiff that beginning in January of 2020, he was going to be an assistant to Moran, who would be the City's first Latin mayor.  (Doc. No. 38 ¶ 24; Doc. No. 43 at ¶ 24; Doc. No. 33-2 at 264:20–265:2.)  Plaintiff told Rivera about her background in human resources during her time in the United States Army and offered her professional assistance if the need arose.  (Doc. No. 38 ¶¶ 5, 24; Doc. No. 43 at ¶¶ 5, 24; Doc. No. 33-2 at 264:20–265:5.)

In 2020, one of Plaintiff's siblings made her aware of an opening for the position of human resources director for the City, a position recently created by referendum.  (Doc. No. 35 at ¶ 3; Doc. No. 33-2 at 18:8–10.)  Plaintiff applied in October of 2020 and excitedly told Maduro about her application.  (Doc. No. 35 ¶¶ 3–4.)  Maduro reminded Plaintiff that she had previously met Rivera, who was now working for the City as an aide to Mayor Moran, and provided Plaintiff with Rivera's phone number.  (*Id.* at ¶ 4; Doc. No. 38 at ¶ 25; Doc. No. 43 at ¶ 25.)  Plaintiff texted Rivera and later spoke with him on the phone, informing him that she

---

[2] Plaintiff was living in southwest Florida but had previously lived in the Reading area and returned periodically to visit family and friends.  (Doc. No. 38 at ¶ 22; Doc. No. 43 at ¶ 22.)

applied for the human resources director position.  (Doc. No. 35 at ¶ 5; Doc. No. 38 at ¶ 25; Doc. No. 43 at ¶ 25; Doc. No. 31 at 1.)

Plaintiff had several interviews for the position, including one with Mayor Moran.  (Doc. No. 35 at ¶ 7; Doc. No. 33-2 at 19:10–22:11.)  During this interview with Moran, Rivera was present and introduced himself, but did not ask questions.  (Doc. No. 33-2 at 30:7–19, 271:22–272:8.)

Plaintiff was ultimately offered the job and began her employment on November 16, 2020.  (Doc. No. 38 at ¶ 4; Doc. No. 35 ¶ 7; Doc. No. 33-1.)  Plaintiff does not believe that Rivera had any hand in getting her the position.  (Doc. No. 35 at ¶ 6; Doc. No. 33-3 at 21:11–23.)  As human resources director, Plaintiff had seven staff members who reported to her.  (Doc. No. 35 at ¶ 9.)  She, in turn, reported to the City's then-managing director, Abe Amoros, and Mayor Moran.  (Doc. No. 34 at ¶ 2.)  Beginning while Plaintiff was interviewing for her position and continuing through their time working together, Plaintiff and Rivera exchanged text messages and spoke on the phone, both during and after business hours.[3]  (*See generally* Doc. No. 31.)

### B.      Rivera and Moran's Relationship and Rivera's Position

Mayor Moran and Rivera first met in 2010 through volunteer opportunities with the Reading School District.  (Doc. No. 38 at ¶ 8; Doc. No. 43 at ¶ 8.)  Over time, they developed a "close" and "friendly" relationship (Doc. No. 33-7 at 6:18–7:16; *see also* Doc. No. 33-6 (reflecting a Facebook post in which Moran publicly thanked Rivera); Doc. No. 33-8 (reflecting a Facebook post from Moran congratulating Rivera on his impending fatherhood)).  As

---

[3] The Court understands that Plaintiff and Rivera communicated with each other through both their work phones and their personal phones.  (Doc. No. 33-3 at 16:5–10.)  However, only the text messages from their personal phones are a part of the record before the Court.  (Doc. No. 31.)

previously noted, Rivera assisted Moran with his 2019 mayoral campaign and once Moran was elected, Rivera helped with his transition into office.  (Doc. No. 38 at ¶ 9; Doc. No. 43 at ¶ 9.) After this transition, Rivera became Moran's special assistant.  (Doc. No. 33-4 at 7:17–24.)  In this capacity, he was a "close aide" who primarily assisted the Mayor with community relations. (Doc. No. 25-8 at 9:8–12; Doc. No. 33-4 at 8:4–15.)  Rivera would keep in contact with members of the community and raise any concerns to Mayor Moran's attention.  (Doc. No. 33-4 at 8:4–15.)  Rivera would also attend the Mayor's morning briefings alongside Amoros, chief of staff Frank Denbowski, and the Mayor's other assistant, Maria Delgado.  (Doc. No. 33-9 at 23:23–24:7.)  At these meetings, Rivera would update the staff on what was going on in the community and inform them of events in which the administration was being asked to participate.  (Doc. No. 38 at ¶ 15; Doc. No. 43 at ¶ 15; Doc. No. 33-9 at 24:16–22.)  As special assistant, Rivera reported to both chief of staff Denbowski and Mayor Moran himself.  (Doc. No. 33-7 at 16:13–15.)

In addition to his regular responsibilities, Rivera would occasionally attend constituent and community meetings in the evenings on behalf of Mayor Moran.  (Doc. No. 38 at ¶ 16; Doc. No. 43 at ¶ 16.)  He would also occasionally attend City Council meetings but "never [as] an official spokesman" for Mayor Moran.  (Doc. No. 33-4 at 19:4–10.)  And although never officially asked to offer his opinion, Rivera would occasionally "chime in" with his views on various City policies and issues that Mayor Moran was confronting.  (*Id.* at 18:18–19:3.) However, Rivera testified that he never made any recommendations regarding the hiring, promoting, demoting, or disciplining of particular individuals.  (*Id.* at 19:11–19.)

Rivera's position as special assistant was largely siloed off from the human resources department where Plaintiff worked.  Plaintiff and Rivera had only three to five work-related

meetings over the course of the year they worked together.  (Doc. No. 35 at ¶ 14; Doc. No. 33-2 at 122:7–18.)  Rivera also had no official oversight over the human resources department or its director (Plaintiff), no official authority to discipline Plaintiff, and no official authority to assign or remove duties from Plaintiff.  (Doc. No. 35 at ¶¶ 30–32 (Defendant Rivera's statement of facts indicating that Rivera had no responsibilities with regard to the human resources department and Plaintiff's response stating that it is undisputed that Rivera had no "official" responsibilities); Doc. No. 33-3 at 76:16–77:16 (Plaintiff testifying to the same); Doc. No. 33-9 at 35:22–36:11 (Amoros testifying to the same); Doc. No. 33-7 at 38:13–39:2 (Moran testifying that Rivera "absolutely" did not have oversight over human resources, and had no authority to discipline, fire, or assign or remove duties from Plaintiff).)

### C.    Rivera Sexually Harasses Plaintiff

#### 1.    The January 2021 Incidents

Rivera first sexually harassed Plaintiff in January of 2021, only a few months after she started her position as human resources director.

On January 12, 2021, Defendant Rivera texted Plaintiff in Spanish saying "se lo paro," which translates to "it went up," followed by a laughing emoji.  (Doc. No. 31 at 5–6; Doc. No. 31-1 at 5.)  Plaintiff interpreted this text to mean that Mayor Moran had an erection.  (Doc. No. 33-14 at ¶ 1.)

Around that same time, Rivera was asking Plaintiff's friend Elsie Maduro questions about Plaintiff's personal life and, in particular, whether Plaintiff was in an "intimate sexual relationship with someone."  (Doc. No. 33-2 at 76:9–18; Doc. No. 33-3 at 29:3–14.)  When Rivera learned Plaintiff was single, he offered, during a conversation in his office, to satisfy her sexual needs.  (Doc. No. 33-2 at 76:9–18; Doc. No. 33-3 at 4:23–5:15; *see also* Doc. No. 33-4 at 50:21–24 (Rivera acknowledging that he might have said this).)  Shortly thereafter, Plaintiff

reported the incident to chief of staff Denbowski and told him that she was very uncomfortable with Rivera's comments.  (Doc. No. 33-2 at 75:14–21.)  Plaintiff also informed Denbowski that she told Rivera that the conduct was inappropriate and asked him to stop.  (*Id.* at 76:19–77:7.)  In response, Denbowski acknowledged that Rivera was "out of control with his comments." (*Id.* at 75:22–76:4.)  Plaintiff did not specifically ask Denbowski to do anything about the incident, but she testified that she expected him to raise the issue to Mayor Moran.  (*Id.* at 79:9–80:4.) However, Plaintiff never followed up with Denbowski to confirm that he spoke to Moran.  (*Id.* at 80:5–17.)

### 2.      The May or June 2021 Incidents

The next instance of harassment occurred around May or June of 2021 when Plaintiff went to see Denbowski in his office.  (Doc. No. 38 at ¶ 34; Doc. No. 43 at ¶ 34; Doc. No. 33-2 at 129:18–130:11.)  Denbowski was not available, and while Plaintiff waited for him to return, she went to Rivera's office.  (Doc. No. 38 at ¶ 34; Doc. No. 43 at ¶ 34; Doc. No. 33-2 at 130:1–11.) Denbowski and Rivera's offices were in the same general area of City Hall such that to reach Denbowski's office, Plaintiff would need to go through Rivera's office.  (Doc. No. 38 at ¶ 35; Doc. No. 43 at ¶ 35; Doc. No. 33-2 at 119:5–11.)  Plaintiff would meet with Denbowski in his office daily or every other day following the morning staff meeting.  (Doc. No. 33-2 at 74:20– 75:8.)  When Denbowski was not in his office, Plaintiff would often wait in Rivera's office.  (*Id.* at 125:14–19.)  This would occur once or twice per week.  (*Id.* at 126:1–12.  *But see id.* 128:15– 23 (Plaintiff indicating that she would be in Defendant Rivera's office at least two or three times per week).)

On this particular occasion, while Plaintiff waited for Denbowski in Rivera's office, Rivera complimented Plaintiff on her outfit and stated in Spanish, "te lo meter," meaning that

that "he want[ed] to stick his dick inside" of her. (Doc. No. 38 at ¶ 36; Doc. No. 43 at ¶ 36; Doc. No. 33-2 at 133:15–134:9.) Plaintiff asked Rivera to stop, but he continued, saying "no, for real." (Doc. No. 33-2 at 134:10–13.) Rivera then told Plaintiff that Mayor Moran's wife was sick and that the Mayor hadn't had sex for approximately a year. (Doc. No. 38 at ¶ 38; Doc. No. 43 at ¶ 38.) He asked Plaintiff if she knew anyone willing to go out with Moran and that he was willing to pay $30,000 for it. (Doc. No. 38 at ¶ 38; Doc. No. 43 at ¶ 38.) Plaintiff interpreted Rivera's question as soliciting her for sex with the Mayor. (*Id.*; Doc. No. 33-2 at 134:10–20.) Plaintiff again told him to stop, that he was being inappropriate, and to not forget that she was the human resources director. (Doc. No. 33-2 at 134:21–135:6.) Rivera responded that there was "a trust" between them. (*Id.*) Plaintiff again admonished him to not forget that she was the human resources director. (*Id.*) Plaintiff then ended the conversation by telling Rivera that she did not know anyone willing to go on a date with the Mayor. (*Id.* at 135:7–10.) Plaintiff testified that she thought that Rivera's question was an attempt to see who, between Rivera and Mayor Moran, "was going to get her first." (*Id.* at 210:11–22.) However, she did not believe that the Mayor was actually sexually or romantically interested in her. (*Id.* at 211:2–16.)

Plaintiff reported this incident to Denbowski that same day. (Doc. No. 38 at ¶ 40; Doc. No. 43 at ¶ 40; Doc. No. 33-2 at 139:4–8.) She testified that her and Denbowski were "to the point where [they] were just ignoring [Rivera's] immature behavior." (Doc. No. 33-2 at 139:9–12.) Plaintiff again did not specifically ask Denbowski to report it to Mayor Moran or her supervisor, Abe Amoros, nor did she ever report this incident to Amoros herself. (*Id.* at 138:18–139:3, 139:19–21.)

### 3.     The August 2021 Incidents and Photo

The next instance of Rivera's inappropriate conduct occurred on the morning of Monday, August 2, 2021.  While Plaintiff was again waiting for Denbowski in Rivera's office, Rivera told Plaintiff that he wanted "to stick his dick in her." (Doc. No. 33-3 at 11:6–19.)  Plaintiff immediately left, not waiting for Denbowski to return.  (*Id.*)

That same day at 11:07 a.m., Rivera texted Plaintiff "Hey," which Plaintiff responded to a few hours later, saying "Que paso??", meaning "what happened??"  (Doc. No. 31 at 49; Doc. No. 31-1 at 49.)  Rivera then texted her in Spanish, saying "ti lo quiero meter," meaning, again, that he wanted "to put his dick in her."  (Doc. No. 31 at 49; Doc. No. 31-1 at 49; Doc. No. 43 at ¶ 41.)  He also asked Plaintiff to call him.  (Doc. No. 31 at 49.)  Plaintiff did not respond to either of these texts.  (*Id.*)  A few hours later, at 3:19 p.m., undeterred, Rivera sent Plaintiff a photograph of ejaculate in the palm of his hand and a text message saying "15 minutes ago. What a waste."  (*Id.*)  Plaintiff responded shortly thereafter, writing "You are nasty!!!!!!!!"  (*Id.* at 50.)  Rivera then replied "That's not nasty.  Those are vitamins."  (*Id.* at 50.)  Plaintiff responded by saying "Crazy," to which Rivera replied "Yo estoy para ti. Between us 2," with the first part translating to "I am yours." (*Id.*; Doc. No. 31-1 at 50.)  Rivera also asked Plaintiff if she was taking him to her new job, which was a reference to a prior conversation in which Plaintiff told Rivera that she was looking for a new job because she did not believe that human resources was being conducted in a proper manner.  (Doc. No. 31 at 50; Doc. No. 31-1 at 50; Doc. No. 33-3 at 39:15–40:11, 66:8–68:4.)[4]  Plaintiff did not respond.  (Doc. No. 31 at 50.)  Later that evening, at 5:14 p.m., Rivera texted Plaintiff again, asking, "can we see each other tonight," to

---

[4] Plaintiff testified that while she told Rivera it was because she did not believe that the human resources was being conducted in a proper manner, it was also due to his behavior.  (*Id.* at 66:8–68:4.)

which Plaintiff responded "estas loco," meaning "you're crazy."  (*Id.*; Doc. No. 31-1 at 50.)

Rivera ended the conversation by saying "Ok leave it there lol.  Your losing the fun lol.  Y el

gusto," with the last sentence meaning "and the taste."  (Doc. No. 31 at 50; Doc. No. 31-1 at 50.)

Soon after this text exchange with Rivera, Plaintiff disclosed the incident to Denbowski

during one of their weekly meetings.  (Doc. No. 38 at ¶ 44; Doc. No. 43 at ¶ 44.)  During this

meeting, Plaintiff showed Denbowski the photograph of the ejaculate in the palm of Rivera's

hand.  (Doc. No. 33-2 at 105:12–15.)  Plaintiff stated that she felt that she needed to tell someone

about this issue and felt comfortable talking to Denbowski.  (Doc. No. 33-2 at 107:8–21; *see also*

Doc. No. 33-3 at 30:24–31:8 (Plaintiff indicating that "she did not feel that she had an open line

of communication with [Amoros], so [Denbowski] was [her] go to").)  But, out of fear of

retaliation due to the recent firing of Elizabeth Kraft, the former City Solicitor who alleged

sexual harassment on the part of Mayor Moran, Plaintiff asked Denbowski not to do anything

about the incident.  (Doc. No. 33-2 at 105:18–106:1.)  Denbowski reiterated that Rivera was out

of control and that Rivera thought he was above everyone and could do and say whatever he

wanted.  (*Id.* at 108:12–24; Doc. No. 38 at ¶ 45; Doc. No. 43 at ¶ 45.)  Denbowski also informed

Plaintiff that he had spoken to Rivera about his behavior previously but couldn't stop him.  (Doc.

No. 33-2 at 108:16–109:13.)[5]

Sometime later in August, after disclosing the incident to Denbowski, Plaintiff had a

meeting with Amoros, who noticed that Plaintiff seemed dismayed.  (Doc. No. 33-9 at 26:19–

27:7.)  When Amoros asked what was wrong, Plaintiff responded that she was "too upset to talk

about it."  (*Id.* at 26:23–27:7.)  Amoros assured her that his "door is always open" if she wanted

---

[5] Denbowski was undergoing chemotherapy at the time.  (Doc. No. 33-2 at 107:22–108:8.)  Tragically, Denbowski passed away in January 2023.  *See* David Kostival, Reading City Council reacts to death of Frank Denbowski, WFMZ, https://www.wfmz.com/news/area/berks/reading-city-council-reacts-to-death-of-frank-denbowski/article_c148a652-9082-11ed-bf44-171de7893c35.html (Jan. 9, 2023).

to talk about whatever was troubling her.  (*Id.* at 27:7–10.)  Plaintiff did not report the incident to Amoros at that time.  (Doc. No. 33-2 at 90:5–11.)  However, in late September of 2021 Plaintiff reported Rivera's photo to the Berks County District Attorney's Office.  (*Id.* at 98:14–99:14.) She also later reported the incident to a City councilwoman, and the deputy police chief, but did not ask them to take official action.  (*Id.* at 95:10–17, 97:10–22, 193:13–194:11.)

###      4.      The September 2021 Incident at the Latino Convention

In late September of 2021, Mayor Moran and his staff were invited to a Latino convention hosted at a local hotel.  (*Id.* at 36:14–21.)  This was a multi-day event and some participants stayed at the hotel.  (*Id.* at 37:4–15.)  On September 29, 2021, Plaintiff sent a text message to Rivera asking for two tickets for the formal gala.  (Doc. No. 33-3 at 53:23–54:12.) Rivera informed her that she did not need a ticket and she could just show up with her friend (former co-worker Dana Rodriguez).  (*Id.* at 53:12–17.)  When she first arrived at the gala, Rivera told Plaintiff that she looked sexy.  (*Id.* at 43:23–44:13.)  At the dinner, Plaintiff sat a table with Rodriguez and Rivera, among others.  (Doc. No. 33-2 at 39:1–8.)  At the end of the night, while Plaintiff, Rodriguez, and Rivera were still sitting at the table, Rivera again told Plaintiff she looked sexy and said, within an earshot of Rodriguez, "te lo meter," meaning "he wanted to fuck" Plaintiff.  (*Id.* at 41:8–20, 45:9–24.)  Plaintiff responded that he was "out of control" and needed to stop.  (*Id.* at 45:21–24.)  Plaintiff and Rodriguez then began to leave the event.  (*Id.* at 46:3–6.)

As they exited the event, Plaintiff and Rodriguez walked through a hallway where there was space for snacks, drinks, and photos.  (*Id.* at 54:20–55:5.)  In the hallway, Plaintiff and Rodriguez interacted with a few other attendees, including a cordial conversation and photo with Mayor Moran.  (*Id.* at 47:6–48:20.)  As Mayor Moran was walking away, Rivera came up to

Plaintiff and Rodriguez and said to Plaintiff, in Spanish, "Yo, the mayor wants to fuck you." (*Id.* at 49:3–17.) Rivera then told Plaintiff that Mayor Moran was going to be "upstairs waiting" for her and gave her his hotel room number. (*Id.* at 52:19–53:1; Doc. No. 38 at ¶ 52; Doc. No. 43 at ¶ 52.) Plaintiff did not believe that Rivera was serious when making this comment and instead thought Rivera gave Plaintiff his own hotel room number as opposed to the Mayor's. (Doc. No. 33-2 at 208:10–209:24; *see also* Doc. No. 33-7 at 27:24–28:2 (Moran testifying that he did not stay at the hotel during the Latino convention).) Plaintiff and Rodriguez then left the event. (Doc. No. 38 at ¶ 53; Doc. No. 43 at ¶ 53.)

### D.    Rivera's Termination

Around October 19, 2021, Denbowski came to Plaintiff, as human resources director, to inform her that Rivera had been inappropriate to a new employee in the finance department. (Doc. No. 33-2 at 83:24–84:6; Doc. No. 38 at ¶ 54; Doc. No. 43 at ¶ 54.) That same day, Plaintiff met with Amoros in person to report Rivera's inappropriate behavior with the new employee. (Doc. No. 38 at ¶ 57; Doc. No. 43 at ¶ 57.) During this conversation, Plaintiff added that she believed Rivera was out of control and showed Amoros the picture of ejaculate that Rivera had sent her in August. (Doc. No. 38 at ¶ 58; Doc. No. 43 at ¶ 58; Doc. No. 33-2 at 84:2–85:6.) Plaintiff told Amoros that she didn't want him to do anything about Rivera's harassment of herself because she was afraid of retaliation. (Doc. No. 38 at ¶ 60; Doc. No. 43 at ¶ 60; Doc. No. 33-2 at 85:7–9.) She also told Amoros that she was planning to resign. (Doc. No. 33-2 at 85:10–11.) Amoros was disgusted by the photo and asked Plaintiff not to leave. (*Id.* at 85:10–11, 92:19–93:3.)

After reflecting on Plaintiff's disclosure, Amoros decided that he needed to report it. (Doc. No. 25-5 at 4–5.) The next business day, he contacted Plaintiff and the two again met in person. (Doc. No. 38 at ¶ 61; Doc. No. 43 at ¶ 61; Doc. No. 33-2 at 85:14–19. *But see* Doc. No.

33-9 at 27 (Amoros indicating that he went to the Mayor immediately after their first meeting).) During this second meeting, Amoros informed her that he had to report the photo to Mayor Moran and hire outside counsel to investigate.  (Doc. No. 38 at ¶ 61; Doc. No. 43 at ¶ 61.)  While Plaintiff reiterated her fear of being retaliated against for reporting Rivera's behavior, Amoros held steadfast that he had to report the incident.  (Doc. No. 38 at ¶¶ 61–62; Doc. No. 43 at ¶¶ 61–62; Doc. No. 33-2 at 85:19–24; *see also* Doc. No. 25-4 (City policy indicating that the "failure to report or investigate unlawful harassment by any supervisor is a serious offense and will result in disciplinary action").)  Plaintiff responded that she had already made Denbowski aware of all of Rivera's actions, so he would be able to answer any questions about this issue.  (Doc. No. 33-2 at 85:24–86:4).  During this second meeting, Plaintiff again showed Amoros the photo of ejaculate and permitted him to take a photo of it.  (*Id.* at 94:12–22.)

With a copy of the photo, Amoros went to Mayor Moran shortly after his conversation with Plaintiff.  (Doc. No. 33-9 at 27:11–17.)  Amoros showed Mayor Moran the photo, shared his disgust, and told Mayor Moran that "under no circumstances was [Rivera] to remain on staff and that he should be escorted from the building immediately."  (*Id.* at 27:18–21; Doc. No. 33-7 at 10:1–11:3.)  Mayor Moran mirrored Amoros's disgust and agreed that Rivera was to be removed from the premises.  (Doc. No. 33-9 at 28:9–13.)  Moran got up, left his office, and when he returned 30 minutes later, told Amoros that Rivera was no longer in the building.  (Doc. No. 38 at ¶ 65; Doc. No. 43 at ¶ 65; Doc. No. 33-9 at 28:19–29:2.)

Rivera was initially placed on administrative leave while an outside law firm, McNees Wallace & Nurick LLC ("McNees"), investigated the allegations.  (Doc. No. 34 at ¶ 10.)  While the investigation was ongoing, Plaintiff learned Rivera was spreading rumors to coworkers, members of the police department, and the investigators, telling them that he was the one who

got Plaintiff her job as human resources director, that the two of them were having a sexual

relationship, and that he had receipts to prove that they had been sharing hotel rooms.  (Doc. No.

33-2 at 101:11–102:1, 110:7–23, 115:7–15, 158:18–159:9, 159:17–23; Doc. No. 25-5 at 7

(Rivera indicating to the investigator that he and Plaintiff kissed and that "he had 'done things to

her' and she to him").)

  Following Rivera's removal from City Hall, Plaintiff immediately began regretting that

she shed light on Rivera's conduct, and she started having feelings of anxiety, stress, and

pressure.  (Doc. No. 33-2 at 158:18–159:23, 160:4–13.)  On Friday, November 26, 2021,

Plaintiff began feeling chest pains during the workday, and was brought to the hospital by one of

her staff members.  (Doc. No. 38 at ¶¶ 72–73; Doc. No. 43 at ¶¶ 72–73; Doc. No. 33-12

(Plaintiff's medical records).)  She was informed that the chest pains were the result of anxiety,

which she believed stemmed from her feeling that she was being discredited and losing her

career.  (Doc. No. 38 at ¶¶ 74–75; Doc. No. 43 at ¶¶ 74–75; Doc. No. 33-2 at 163:18–24,

164:11–14.)  Plaintiff later went to the VA hospital where she was diagnosed with depression

and anxiety, and informed that she had experienced a panic attack.  (Doc. No. 33-2 at 164:11–

24.)  She was prescribed anti-anxiety medication and asked to attend therapy.  (*Id.* at 164:15–

165:7.)  Following this hospital trip, Plaintiff felt that her job was not worth the strain on her

health.  (Doc. No. 33-2 at 158:24–159:9.)  Thus, on November 26, 2021, Plaintiff submitted her

resignation (effective December 15, 2021), to Mayor Moran and Amoros.  (Doc. No. 33-13

(Plaintiff's resignation email).)

  On December 6, 2021, the outside investigation into Rivera's conduct was completed and

a report was submitted to City Solicitor Fred Lachat.  (Doc. No. 25-5.)  During the course of the

investigation, the McNees firm reviewed, among other things, Rivera and Plaintiff's text

messages and interviewed Plaintiff, Amoros, Denbowski, Maria Delgado, Rivera, and Dana Rodriguez.[6]  (*Id.* at 1–2.)  The report concluded that Rivera's conduct violated "multiple City of Reading policies, including the Workplace Violence Prevention Policy, the Employee Conduct and Work Rules and the Sexual and Other Unlawful Harassment Policy."  (*Id.* at 10.)  It found that there was "no credible evidence" to support Rivera's allegations that he and Plaintiff had a relationship that crossed the line from friendship into intimacy or that she asked him to send the photo of ejaculate.[7]  (*Id.* at 11.)  The report also noted that "Denbowski failed to take immediate action when confronted with [Plaintiff's] complaint" and that despite Plaintiff asking him to keep the text a secret, his position as chief of staff, "is a management level position and his inaction could be attributed to the City."  (*Id.*)  After the investigation, City Solicitor Lachat reprimanded Denbowski regarding his obligations to report sexual harassment, even if the harassment was endured by the human resources director.  (Doc. No. 25-8 at 9:13–10:8 ("I essentially reprimanded him . . . on reporting; it doesn't matter what somebody tells you, even if it's the HR

---

[6] In total, the investigator reviewed:  1) screenshots of the text messages between Rivera and Plaintiff on August 2, 2021 provided by Plaintiff and Amoros, 2) a screenshot of Plaintiff's comment on Rivera's Facebook post announcing the birth of his son, 3) a screenshot of a text message conversation between Rivera and Dana Rodriguez, 4) the text exchange between Plaintiff and Rivera from July 14, 2021 to September 10, 2021 provided by Plaintiff, and 5) the text exchange between Plaintiff and Rivera from October 16, 2020 to October 21, 2021 provided by Rivera.  (Doc. No. 25-5 at 1–2.)  As to these latter two categories, because the exhibits that the McNees firm reviewed were not provided to the Court, it is unclear whether the investigator reviewed the text messages from both Plaintiff's work and personal phone.  However, given that the text messages from the work phone were never provided to the Court, we presume that this review consisted only of the texts from Plaintiff's personal phone.

[7] For context, Rivera indicated to the investigator that the picture of his ejaculate stemmed from a conversation he had with Plaintiff that day in which she indicated that he had been single for a while and asked him what he does to satisfy himself.  (Doc. No. 25-5 at 7.)  Rivera responded, "what do you think," implying masturbation.  (*Id.*)  Rivera alleged that Plaintiff said what a waste and asked for proof.  (*Id.*)  Rivera then purportedly responded that he would send it to her when he got home.  (*Id.*)  As indicated above, the investigator found no credible evidence that this conversation occurred.  (*Id.* at 11.)  And regardless, viewing the evidence in light most favorable to Plaintiff, as the Court must at this stage, the Court gives no consideration to the veracity of Rivera's story and credits Plaintiff's version that the photo was unprompted.

director, if they tell you don't share this with anybody, you know, he has an obligation to share

that, and he understood.").)  In light of these findings, the Mayor terminated Rivera, effective

December 6, 2021.  (Doc. No. 35 at ¶ 26; Doc. No. 34 at ¶ 13.)

On December 8, 2021, Moran summoned Plaintiff to his office, where he handed her two

letters and asked her to read them.  (Doc. No. 38 at ¶ 77–78; Doc. No. 43 at ¶¶ 77–78.)  During

this meeting, Plaintiff reported that the Mayor's demeanor was "cold" and "curt."  (Doc. No. 33-

2 at 184:23–185:1, 185:18–22.)

The first letter informed Plaintiff that the investigation of Rivera had been completed,

that her allegations had been substantiated, and that corrective measures would be taken.  (*Id.*;

Doc. No. 33-15 (the letter).)  In other words, Rivera had been terminated.  Plaintiff testified that

the Mayor explained that the decision to fire Rivera was "really hard" because Rivera was "like

his son."  (Doc. No. 33-2 at 185:2–6; *see also* Doc. No. 25-8 at 11:20–12:7 (Lachat indicating

that terminating Rivera was "very hard" for the Mayor).)

The second letter asked Plaintiff to rescind her resignation.  (Doc. No. 38 at ¶ 81; Doc.

No. 43 at ¶ 81; Doc. No. 33-16.)  After reading this letter, Plaintiff discussed certain conditions

that she required before she would agree to remain on the job.  (Doc. No. 38 at ¶ 82; Doc. No. 43

at ¶ 82.)  Plaintiff described this conversation as "one-way."  (Doc. No. 33-2 at 190:13–191:1.)

First, Plaintiff demanded that she have the opportunity to work with outside labor counsel to

resolve disagreements she had with City Solicitor Lachat about the interpretation of the

Personnel Code.  (Doc. No. 38 at ¶ 83; Doc. No. 43 at ¶ 83; Doc. No. 33-2 at 189:24–190:12.)

Mayor Moran responded "okay."  (*Id.* at 190:13–17.)  Second, Plaintiff raised concerns she had

regarding positions and duties that had previously been taken from her, including certain roles in

EEO investigations and a pension coordinator position.  (*Id.* at 190:21–191:24.)  Plaintiff asked

to meet at a later date to discuss these concerns further, to which Moran again replied "okay." (*Id.* at 191:19–192:24.)

The Mayor agreed to give Plaintiff a few days to decide whether she would rescind her resignation. (Doc. No. 33-16.) On December 9, 2021, Plaintiff notified Moran that her resignation was rescinded, and she would remain on the job. (Doc. No. 33-17.)

### E.   Plaintiff's Termination

Over the course of Plaintiff's time at City Hall, including before the Mayor asked her to rescind her resignation, Plaintiff's supervisors were concerned with her work performance. (Doc. No. 33-9 at 10:14–17:10, 20:8–22 (Amoros testifying that he was unhappy with her performance and hoped it would improve); Doc. No 33-7 at 20:13–18 (Moran indicating that there had been "some concerns that w[ere] brought to [his] attention with [Plaintiff's] job performance" before he asked her to rescind her resignation); Doc. No. 25-9 at 4 (Amoros saying to the investigator that he thought Plaintiff's work product "was awful and that she lacked accountability").)[8] Amoros testified that he received constant complaints about Plaintiff from the former solicitor, the finance director, and the police chief. (Doc. No 33-9 at 11:18–12:2, 17:19–18:7.) Plaintiff was also subjected to numerous investigations regarding the propriety of her conduct. (Doc. No. 33-2 at 241:17–242:1 (Plaintiff testifying that there was an investigation

---

[8] Citing a footnote in *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005), Plaintiff argues, in conclusory fashion, that the Court cannot consider the testimony of Lachat, Amoros, or Moran because these parties are "interested." (*See, e.g.*, Doc. No. 34 at ¶¶ 16–18.) Plaintiff stretches the caselaw she relies on too far. As the Third Circuit has stated more recently "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007); *see also Gazdick v. Solis*, No. 3:10-CV-1062, 2013 WL 1909576, at *9 (M.D. Pa. May 8, 2013) (addressing a nearly identical argument, finding that "[t]aking this argument to its logical conclusion, a court could never consider a defendant's deposition or affidavit because he is an interested party, rendering discovery of a defendant's testimony useless for summary judgment purposes" and that this stretches the caselaw "too far"). Plaintiff also fails to explain how Amoros in particular was an interested witness. Amoros did not have a role in Plaintiff's suspension or later termination and as of February 12, 2022, no longer works for the City of Reading. (Doc. No. 33-9 at 33:5–14.)

against her in March of 2021 regarding an allegation that Plaintiff "terminated employees inappropriately"); Doc. No. 33-3 at 41:14–42:3 (Plaintiff testifying that she texted Rivera about another investigation into her conduct); *id.* at 48:11–24 (Plaintiff indicating that the City opened an investigation into her conduct due to allegations from then-police chief).)  However, out of concern that Rivera's harassment could be the cause of these performance issues, the City wanted to give her a second chance in the hopes that, with that distraction removed, she would "hit a home run." (Doc. No. 25-8 at 15:15–16:10; *see also* Doc. No. 33-9 at 19:16–19 (Amoros indicating that he did not think her performance was sufficiently deficient to warrant termination at the end of 2021).)

On February 7, 2022, while on bereavement leave, (Doc. No. 33-2 at 234:23–235:9), Plaintiff filed a charge of discrimination against the City with the EEOC (Doc. No. 33-10).  That same day, at 9:33 a.m., Plaintiff sent an email to Amoros, Denbowski, and Mayor Moran informing them that she had filed this charge.  (Doc. No. 33-19.)  Roughly two hours later, Plaintiff also sent an email to the members of the City Council informing them of her EEOC charge and urging them to "recognize there is an ongoing, serious problem here, and to protect [her] from retaliation."  (Doc. No. 33-20.)

Two days later, on February 9, 2022, Lachat and Amoros met with Plaintiff in Lachat's office.  (Doc. No. 38 at ¶ 91; Doc. No. 43 at ¶ 91.)  They handed Plaintiff a letter from Mayor Moran dated February 7, 2022,[9] informing her that she was being placed on leave pending the conclusion of an outside investigation into her conduct.  (Doc. No. 33-21.)  The letter asserted the following rule violations:

---

[9] While the letter indicates that it was sent via email and is dated February 7, the parties informed the Court at oral argument that discovery did not reveal whether it was in fact sent via email or whether Plaintiff would have received this letter prior to it being hand delivered to her.  (Mar. 7, 2023 Hr'g Tr. at 21:11–22:17.)

- (1) A series of documented instances of misrepresenting and outright [sic] lying to City Officials, including a false allegation made by email and reiterated to City Council at a public meeting that one of your subordinates – and not yourself – was responsible for payroll records being withheld from the City Auditor;

- (2) Demeaning, unprofessional, and hostile communications with your staff and other City officials;

- (3) Failure to complete assigned tasks including critical aspects of internal investigations;

- (4) Disregarding the legal advice of the City Solicitor and others, including an instance where you instructed the payroll coordinator to withhold records from the City Auditor and a second instance where you instructed the payroll coordinator to withhold salary increases to several City employees;

- (5) Insubordination, and specifically, failure to comply with my written directive that you forward complaints to the Law Department; and

- (6) Engaging outside counsel without authorization and engaging outside counsel for assignment designed to undermine the authority of the Managing Director and Finance Director.

(Doc. No. 33-21.)  While the record is not entirely clear as to the source of each misconduct allegation, it appears that some of the underlying complaints came from City Solicitor Lachat. (Doc. No. 25-8 at 17:12–18.)

After placing Plaintiff on leave, the City again retained McNees to investigate the allegations into Plaintiff's misconduct.  (Doc. No. 25-9 at 1–2.)  Over the course of the investigation, the McNees firm reviewed over 475 pages of emails, watched a video of Plaintiff's conduct at a City Council meeting, and interviewed a variety of witnesses including one of

Plaintiff's staff members, Denbowski, and Amoros, who was no longer working at City Hall at the time.  (*Id.* at 2, 6.)

Plaintiff was provided the opportunity to be interviewed as a part of the investigation but instead chose to submit a written response.  (*Id.* at 2; Doc. No. 33-2 at 169:13–170:10.)  In her response, Plaintiff denied that she engaged in misconduct and addressed each allegation as follows:

- **First Bullet**: Plaintiff requested more information regarding the "false allegation [she was] accused of making."  (Doc. No. 33-22 at 1.)  She then proceeded to address the allegations around her conduct at a City Council meeting in which she was alleged to have blamed a subordinate for not sending the required payroll documents to the City Auditor.  (*Id.*)  She responded that she had emailed everyone involved in December of 2021 saying that she did not have a problem providing the payroll documents to the City Auditor.  (*Id.*)  Plaintiff further stated that she was unaware that the requested back-up documentation was not received by the auditor until right before the City Council meeting and that when notified, she immediately called the payroll administrator and asked her to forward the required materials to the auditor.  (*Id.*; Doc. No. 33-2 at 216:8–218:2 (testifying to the same).)  Plaintiff admitted to saying that the payroll administrator took responsibility, but claimed she meant that the payroll administrator acknowledged that she hadn't sent the backup documentation and instead sent the payroll summaries.  (Doc. No. 33-22 at 1.)

- **Second Bullet:** Plaintiff detailed a confrontational email exchange that she had with a member of the police department, but claimed the others were being "condescending, unprofessional, and demeaning" toward her and that she was just defending herself.  (*Id.* at 2.)  She also acknowledged that she "verbally admonished" two members of her staff multiple times for going to other directors to discuss human resources matters.  (*Id.*)

- **Third Bullet**: Plaintiff stated that she needed more information before she was able to respond to the allegation that she failed "to complete assigned tasks." (*Id.*)[10]

- **Fourth Bullet**: Plaintiff responded that, as human resources director, she was obligated to follow the Personnel Code and was unwilling to violate it without written directive from the Mayor.  (Doc. No. 33-22 at 3; *see also* Doc. No. 33-2 at

---

[10] She later testified in this case that she did not believe this allegation was true.  (Doc. No. 33-2 at 218:11–19.)

219:4–221:3 (Plaintiff similarly testifying that she was told by the City Solicitor to process the increases for the City employees but chose not to without a directive from the Mayor because she feared a "he said she said" scenario).)

- **Fifth Bullet:** Plaintiff claimed that she in fact forwarded all complaints to the law department and provided examples of her doing so.  (Doc. No. 33-22 at 3–4; Doc. No. 33-2 at 221:4–16 (Plaintiff testifying to the same).)

- **Sixth Bullet:** Plaintiff responded that she received authorization to retain a labor lawyer from the Mayor during her meeting with him on December 8, 2021 as a condition for her rescinding her resignation.  (Doc. No. 33-22 at 4; Doc. No. 33-2 at 189:24–190:6 (Plaintiff testifying to this condition).)

On April 13, 2022, the City received a final report from McNees.  (Doc. No. 25-9.)  It sustained all but one of Plaintiff's alleged infractions, finding insufficient evidence to support the position that Plaintiff failed to forward complaints to the Law Department.  (*Id.* at 13.)  As to the other claims, the report found sufficient evidence to support the allegations that Plaintiff was "insubordinate, violated personnel policies, performed and conducted herself in an unsatisfactory manner, and was disrespectful and hostile to City officials and employees."  (*Id.* at 15.)[11]  On April 22, 2022, Plaintiff was informed in a letter from Mayor Moran that following the investigation and for the same reasons outlined in the suspension letter, she was terminated. (Doc. No. 33-23.)

Plaintiff subsequently filed this lawsuit on March 29, 2023.  (Doc. No. 1.)  She asserts claims against the City for retaliation and sex discrimination in the form of a hostile work environment under Title VII and the PHRA.  (*Id.*)  She also asserts a claim under 42 U.S.C.

---

[11] Plaintiff argues that McNees, as "an agent of the City," is an interested party and therefore the Court cannot consider its determinations as to Plaintiff's misconduct.  (Doc. No. 34 at ¶ 20.)  For the same reasons discussed above, the Court firmly rejects this approach as an overreading of 20-year-old caselaw. *See supra* at 16 n.8.  Moreover, Plaintiff's response ignores the fact that while retained by the City, McNees was intended to serve as an *independent* investigator and therefore is unlikely to be considered an interested party even under Plaintiff's approach.  Plaintiff's counsel conceded at oral argument that he had no objection as to the independence of McNees or the integrity of their investigation.  (Mar. 7, 2023 Hr'g Tr. at 24:8–14, 28:6–19.)

§ 1983 against Rivera for unlawful sex discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and against Mayor Moran for unlawful retaliation, also in violation of the Equal Protection Clause.  (*Id.*)

## II.      Legal Standard

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot

simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## III.        Discussion

The Court begins by addressing Plaintiff's claim for hostile work environment against the City under Title VII and the PHRA.  We then turn to the claim of retaliation against both the City and Mayor Moran.[12]  Finally, we will address Plaintiff's claim for sexual harassment against Rivera, and whether such actions were taken under the color of state law.

### A.        Hostile Work Environment

Plaintiff brings a hostile work environment claim against the City.  To establish a hostile work environment, a plaintiff must show that:  1) she suffered intentional discrimination because of her sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of respondeat superior liability.  *Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021) (citing *Minarsky v. Susquehanna County*, 895 F.3d 303, 310 (3d Cir. 2018)).  "The first four elements of this claim establish that a hostile work environment existed." *Huston v. Procter & Gamble Paper Prods.*

---

[12] The same legal standards apply to Title VII and the PHRA, so the Court considers Plaintiff's Title VII and PHRA claims for hostile work environment and retaliation together.  *See, e.g.*, *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996))).

*Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  The fifth element "establishes the basis on which to hold the employer liable."  *Id.*

Here, the City argues that Plaintiff has failed to establish the second and fifth prongs: that she suffered discrimination that was "severe or pervasive" and that respondeat superior liability exists.  (Doc. No. 25 at 12–22.)[13]  The Court addresses each issue in turn.

### 1.  Severe or Pervasive

First, the City asserts that Plaintiff has failed to put forth evidence demonstrating that she faced sufficiently severe or pervasive harassment.[14]  (Doc. No. 25 at 12- 14.)  Conduct is "severe or pervasive" when it is "sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'" *Moody v. Atlantic City Bd. Of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Whether a work environment is sufficiently hostile to meet the severe or pervasive test is a context specific inquiry that requires the Court to look at the totality of the circumstances. *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("[The severe or pervasive] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.").  This totality of the circumstances analysis includes examining the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[13] Because Defendants included both their statement of facts and their memorandum in the same filing, the Court uses the pagination assigned by the ECF system.

[14] The City initially argued this under the incorrect standard, suggesting that Plaintiff must show that harassment was sufficiently "severe *and* pervasive." (Doc. No. 25 at 12.)  However, the City conceded at oral argument that the correct standard is in fact "severe or pervasive." (Mar. 7, 2023 Hr'g Tr. at 3:2–11.) *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) ("The correct standard is 'severe or pervasive.'").

with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88

(1998) (internal quotation marks omitted).  Because Title VII is not a "general civility code," this

standard is "demanding" and will not prohibit "simple teasing" or "offhand comments." *Id.*

("Properly applied, [this standard for hostility] will filter out complaints attacking 'the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing.'" (quoting B. Lindemann & D. Kadue, Sexual Harassment in

Employment Law 175 (1992)).  But "while a hostile work environment claim typically involves

a pervasive pattern of abuse, a claim can arise from isolated incidents when those incidents are

'extremely serious.'" *Gatter v. IKA-Works, Inc.*, No. CV 16-953, 2016 WL 7338770, at *9 (E.D.

Pa. Dec. 19, 2016) (quoting *Faragher*, 524 U.S. at 787 (1998)).  Moreover, this analysis "must

concentrate not on individual incidents, but on the overall scenario." *Caver v. City of Trenton*,

420 F.3d 243, 262–63 (3d Cir. 2005).

The City argues that Rivera's conduct presented the type of "sporadic incidents of

sexually inappropriate language" that fail to meet the standard of a hostile work environment.

(Doc. No. 25 at 13 (quoting *Benny v. Pa., Dep't of Corr. State Corr. Inst. At Somerset*, 211 F.

App'x 96, 97 (3d Cir. 2006)).[15]  The Court disagrees and instead finds that Rivera's conduct was

sufficiently frequent and offensive that a reasonable jury could find that Plaintiff endured a

hostile work environment.

Rivera began harassing Plaintiff just a few months after she began working at City Hall

by prying into her sex life and offering to satisfy her sexual needs.  (Doc. No. 33-2 at 76:9–18;

---

[15] The City also asserts that Plaintiff alleges only four instances of harassment at the hands of Rivera.
(Doc. No. 25 at 12.)  As the description of the facts earlier in this opinion makes clear, the City's tallying
is wrong. *See supra* at 5–15.  Rivera may have made sexualized comments to Plaintiff *in person* on just
four occasions, but his harassment extended beyond just in person comments and included inappropriate
text messages, as well as sexualized rumors about Plaintiff. *Id.*

Doc. No. 33-3 at 4:23–5:15; *see also* Doc. No. 33-4 at 50:21–24 (Rivera acknowledging that he might have said this).)  And this was not a one-off comment.  Instead, Rivera proceeded to directly proposition Plaintiff for sex at least four more times, frequently repeating the degrading comment that he wanted to "stick his dick in" her.  (Doc. No. 38 at ¶ 36; Doc. No. 43 at ¶ 36 (asserting that Rivera told Plaintiff in May or June of 2021 that he wanted to "stick his dick in her"); Doc. No. 33-3 at 11:6–19 (describing how Rivera told Plaintiff in August of 2021 that he wanted to "stick his dick in her"); Doc. No. 31 at 49 (text message from Rivera in August 2021 indicating that he wanted to "stick his dick in" Plaintiff); Doc. No. 33-2 at 41:8–20, 45:9–24 (Plaintiff testifying that Rivera told her he wanted to fuck her in September of 2021 at the Latino convention).)  Rivera also made comments about Plaintiff's looks, telling her on at least one occasion that she was sexy.  (Doc. No. 33-2 at 41:8–15, 43:23–44:13.)  Rivera's conduct was so frequent and abominable that even his supervisor, Denbowski, commented that Rivera was "out of control" and thought he could do whatever he wants.  (Doc. No. 33-2 at 75:22–76:4, 108:12–24); *cf. Williams v. US Airways, Inc.*, No. CV 06-04797, 2009 WL 10736220, at *4 (E.D. Pa. Aug. 28, 2009) (finding significant, in holding that the severe or pervasive prong was met that Plaintiff's supervisor commented that the harasser was a "pig" who would "get himself fired").

And making matters worse, Rivera made sexual comments not only about himself, but also about Mayor Moran.  This included texting Plaintiff that Moran had an erection (Doc. No. 31 at 5–6; Doc. No. 31-14 at ¶ 1), talking about Moran's marital sex life and implicitly soliciting Plaintiff for sex with Mayor Moran by asking her if she knew anyone willing to go out with him for $30,000 (Doc. No. 38 at ¶ 38; Doc. No. 43 at ¶ 38), and telling Plaintiff at the Latino convention that the Mayor wanted to "fuck" her (Doc. No. 33-2 at 49:3–17).  Regardless of whether Rivera was telling the truth or whether Plaintiff believed that Moran truly wanted to

have a sexual relationship with her, these comments contributed to a degrading and sexualized workplace.

Rivera did not stop at lascivious language.  In August of 2021, during work hours, Rivera sent an unprompted and disturbing photo of ejaculate in his hand.  (Doc. No. 31-1 at 49.)  Rivera then followed this photo with vulgar text messages such as telling Plaintiff that his photo depicted "vitamins," asking if he could see her that night, and responding to her rejection by saying that she was missing out on "the taste."  (*Id*.)  This photo, especially when paired with the text messages implying that the ejaculate was for Plaintiff's consumption, arguably meets the severe prong in and of itself.  *See U.S. E.E.O.C. v. Dillard's, Inc.*, No. 607-CV-1496-ORL-19GJ, 2009 WL 789976, at *9 (M.D. Fla. Mar. 23, 2009) (finding singular instance of employee masturbating in front of the plaintiff was sufficiently severe to survive summary judgment); *Moore v. Cricket Commc'ns, Inc.*, 764 F. Supp. 2d 853, 858–59 (S.D. Tex. 2011) (finding display of a nude photo to Plaintiff was "hostile, abusive, and indeed outrageous conduct").  Indeed, Mayor Moran found the conduct sufficiently offensive that he escorted Rivera out of the building within 30 minutes of learning of the photo.  (Doc. No. 38 at ¶ 65; Doc. No. 43 at ¶ 65; Doc. No. 33-9 at 28:19–29:2.)  At the very least, this photo, which the City's briefing largely avoids discussing, weighs heavily in favor of finding that this is a factual issue that should go to a jury.

Rivera's harassment also persisted through his administrative leave and the City's outside investigation.  While neither party draws much attention to this issue in their briefing, Rivera went on a crusade around City Hall spreading false rumors to Plaintiff's coworkers, the police department, and even the investigator that he and Plaintiff were in an intimate relationship and that he had receipts to show that the two of them had shared hotel rooms together.  (Doc. No. 38

at ¶ 70; Doc. No. 43 at ¶ 70; Doc. No. 33-2 at 101:11–102:1, 110:7–23, 115:7–15, 158:18–159:9, 159:17–23.)  These lies subjected Plaintiff to such immense humiliation and fear for her career, that she endured a panic attack necessitating a hospital visit and initially resigned from her position.  (Doc. No. 38 at ¶¶ 74–75; Doc. No. 43 at ¶¶ 74–75); *see Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 132–34 (3d Cir. 2011) (noting that rumors of sexual nature "contribute to the full panoply of events that could be considered as contributing to the hostile work environment"); *Ivins v. Pa. Dep't of Corr.-State Corr. Inst. at Graterford*, No. CV 17-5777, 2019 WL 13275785, at *1 (E.D. Pa. Aug. 22, 2019) (finding, in a post-trial motion, sufficient evidence of severe or pervasive harassment in part based on coworkers spreading rumors about the plaintiff's sexual proclivities).

All told, Plaintiff has set forth a record depicting a workplace inflicted with inappropriate and repugnant conduct that transcends innocuous teasing.  And, contrary to the City's attempts to cast Rivera's conduct as only isolated incidents of sexual comments, Plaintiff has presented evidence that she was propositioned for sex on multiple occasions, subjected to sexual comments on behalf of Mayor Moran, sent a disgusting photo and degrading text messages during work hours, and was the victim of a smear campaign in which Rivera falsely told others the two had a sexual relationship.  While not occurring daily, these actions and statements were significant, humiliating, and likely could have affected Plaintiff's work performance.[16]  The Court finds that this record at the very least has created an issue of fact, sufficient to go to a jury, as to whether Plaintiff was exposed to a severe or pervasive harassment.  *See Carey v. Chadds Ford Tavern*,

---

[16] Members of City management thought the conduct affected Plaintiff's work performance as Lachat testified that they gave Plaintiff a second chance despite alleged performance issues due to their concern that Rivera's conduct may have been a cause of her deficiencies.  (Doc. No. 25-8 at 15:15–16:14 ("So we thought all right, maybe this situation," meaning Rivera's harassment, "was part of the performance issues").)

No. CV 20-4236, 2021 WL 5448960, at *2–3 (E.D. Pa. Nov. 22, 2021) (finding evidence of four sexual comments, three statements from manager about the plaintiff "blowing him," and the manager moving his crotch in her face when the plaintiff bent down was sufficient to defeat summary judgment); *Papp v. MRS BPO LLC*, No. CIV.A. 13-3183, 2015 WL 5247005, at *8 (D.N.J. Sept. 9, 2015) (denying summary judgment where the plaintiff had presented evidence that she was subjected to repeated sexual comments and advances and that her manager showed her a graphic photo of himself); *Jacobsen v. Meron Med., LLC*, No. CV 20-6357, 2022 WL 1567793, at *10–11 (E.D. Pa. May 18, 2022) (finding that there was an issue of fact preventing summary judgment where a coworker pried into the plaintiff's dating life following her divorce, bragged about his sexual exploits, told the plaintiff that they would hook up if he wasn't married and made derogatory statements about women); *Grooms v. City of Philadelphia*, Civil Action No. 17-2696, 2018 WL 4698856, at *7 (E.D. Pa. Sept. 28, 2018) (finding issue of fact preventing summary judgment where the plaintiff's superior "vividly described to Plaintiff sexual acts that he wanted to perform on her," made another sexual remark, and the plaintiff was asked on a date by another coworker); *cf. Nitkin*, 2021 WL 4860742, at *13 (finding no severe or pervasive harassment in part because the coworker "never propositioned [her] for a date or sex, never touched her, and never directed sexually inappropriate comments specifically at her").[17]

---

[17] The cases that the City relies on do not command a different result. The City first cites to a Third Circuit case and a Supreme Court case, which found arguably more severe conduct was sufficient to meet this portion of a hostile work environment claim. (*See* Doc. No. 25 at 13–14 (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986)).) This authority sheds little light on whether the conduct at issue here, when viewed in its totality, *fails* to demonstrate severe or pervasive harassment as a matter of law. Then, in its reply brief, the City cites a 2001 opinion from the Eastern District of Pennsylvania granting summary judgment for an employer where the harasser touched the plaintiff's breast, propositioned her to join him later that evening, made several suggestive comments regarding her eyes, offered her financial assistance if she would go out with him, removed a bottle of wine from his pants, offered her a drink, and asked her to join him at a local hotel later for a "good time." *Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439–40 (E.D. Pa. 2001). However, this opinion, which appears to set the high-water mark on this issue in this district, is not binding on this Court, and we find its reasoning unpersuasive in light of the record before us.

### 2. Respondeat Superior

Having found that Plaintiff has presented a triable issue as to whether she endured severe or pervasive harassment, the Court turns to whether Plaintiff has met the respondeat superior requirement.  As discussed above, this prong of the hostile work environment claim hones in on whether the employer can be held liable for their employee's misconduct.   *Huston*, 568 F.3d at 104.  The appropriate standard applicable under this factor depends on "whether the harasser is the victim's supervisor or merely a coworker."  *Id.*  In cases such as this, where the harasser is a co-worker rather than a supervisor, liability only attaches if the employer "failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  *Id.*  In other words, "an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment."  *Id.* at 104–05.

Here, Plaintiff does not dispute that the City provided a reasonable avenue for her to lodge a complaint but rather focuses on the second way of proving respondeat superior: whether the City "knew" of the harassment and "failed to take prompt and appropriate remedial action."  *Id.*  An employer is deemed to have knowledge of harassment if "management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment."  *Andrews*, 895 F.2d at 1486.  In explaining the meaning of "management-level employees" the Third Circuit has held that:

> [A]n employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer in two circumstances: first, where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties.  In this case, the

> employee usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining employees or by changing their employment status or work assignments. The employee's knowledge of sexual harassment is then imputed to the employer because it is significant to the employee's general mandate to manage employer resources, including human resources.
>
> Second, an employee's knowledge of sexual harassment will be imputed to the employer where the employee is specifically employed to deal with sexual harassment. Typically such an employee will be part of the employer's human resources, personnel, or employee relations group or department.

*Id.* at 107.

Here, the record reflects that Plaintiff informed chief of staff Denbowski of nearly every instance of Rivera's inappropriate conduct soon after it occurred.  Indeed, after Rivera told Plaintiff that he was willing to satisfy her sexual needs, Plaintiff promptly reported the incident to Denbowski.  (Doc. No. 33-2 at 75:14–76:4.)  Then again, when Rivera told Plaintiff he wanted to "stick his dick inside" of her and asked Plaintiff if she knew anyone willing to go on a date with the Mayor for money, she reported Rivera's comments to Denbowski that same day.  (Doc. No. 38 at ¶¶ 36–40; Doc. No. 43 at ¶¶ 36–40.)  And finally, when Rivera sent Plaintiff the disturbing photo of his ejaculate, she reported it to Denbowski almost immediately thereafter and showed him the photo.  (Doc. No. 38 at ¶ 44; Doc. No. 43 at ¶ 44.)

There is no dispute that Denbowski was a management-level employee.  (*See* March 7, 2023 Hr'g Tr. at 5:14–16; 49:23–50:1 (the City acknowledging at oral argument that Denbowski was a management-level employee).)  Indeed, as chief of staff, Denbowski was a direct report to the Mayor and in one of the most senior positions in City Hall.  (*Id.* (acknowledging that Denbowski was a high-level employee who could terminate Rivera).)  Also, while not dispositive, the Court finds significant that the City's own outside investigator concluded that Denbowski's knowledge of Rivera's conduct could be imputed to the City due to his position as

chief of staff.  (*See* Doc. No. 25-5 at 11 ("Mr. Denbowski failed to take immediate action when confronted with Ms.  Acevedo's complaint. . . .  [H]is position as Chief of Staff, a direct report to the mayor, is a management level position and his inaction could be attributed to the City.").) And perhaps even more significant than his seniority in City Hall, Denbowski was one Rivera's supervisors.  (Doc. No. 33-7 at 16:13–15.)  Denbowski was thus in as good of a position as anyone to stop Rivera from harassing Plaintiff.  *See Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 307 (W.D. Pa. 2020) ("To impute McNulty's knowledge of the Krenzelak incident to Defendant, Plaintiff would have to show that McNulty was sufficiently senior that he had the authority to act on Defendant's behalf to stop the harassment.").  But despite being informed of Rivera's offensive behavior on numerous occasions, Denbowski did next to nothing to put an end to his harassment.

Although they do not dispute that Denbowski was a manager who knew of the harassment Plaintiff endured and failed to report the issue to the Mayor or otherwise take any action, the City argues that Plaintiff fails to meet the respondeat superior requirement because: 1) Plaintiff was obligated to report this incident to her direct supervisor, Amoros, not Denbowski, under the City's sexual harassment policy; and 2) Plaintiff disclosed the harassment to Denbowski in confidence and specifically asked him not to do anything because she was afraid of retaliation.  (Doc. No. 25 at 14–22.)  Neither argument carries the day.

First, the Court is unpersuaded by Defendant's argument that respondeat superior liability should not attach because the City's policy directed Plaintiff to inform her supervisor, Amoros, of Rivera's conduct, not chief of staff Denbowski.  (Doc. No. 25 at 14–17.)  The City has not cited, nor has the Court found any authority requiring an employee to report an instance of sexual harassment consistent with the employer's policy before the respondeat superior

requirement is met.  (Mar. 7, 2023 Hr'g Tr. at 5:3–13 (acknowledging that Defendants could not find caselaw requiring a plaintiff to report harassment consistent with company policy before it is imputed to the employer.)  And, such an argument appears inconsistent with the Third Circuit's reasoning in *Huston*, where the Court held that knowledge of harassment is properly imputed to an employer if the information is in the hands of  members of management who were in a position to stop the harassment, not a specifically designated member of management.  *Huston*, 568 F.3d at 107.  Applied here, Plaintiff's reporting to Denbowski was sufficient.[18]

The Court also finds unconvincing the City's argument that Plaintiff revealing the harassment in confidence and asking Denbowski not to take any action should alleviate any respondent superior liability.  (Doc. No. 25 at 17–20.)  While the City does not explicitly say so, this argument appears to attack whether the City "failed to take prompt and appropriate remedial action."  *Huston*, 568 F.3d at 104.  However, in light of the competing obligations Denbowski faced between Plaintiff's purported request for secrecy and his obligation to report instances of sexual harassment, we cannot hold that Denbowski and the City's reaction was "appropriate" as a matter of law and instead find that there is an issue of fact for the jury to decide.  The Court acknowledges that the reporting obligations were complicated by the fact that Rivera brazenly harassed the director of human resources, who would typically be involved in resolving issues of

---

[18] The Court notes that the City's sexual harassment policy also provides that if an employee's supervisor was "unavailable or [they] believe it would be inappropriate to discuss it with [their] supervisor" employees could in the alternative "immediately contact the Human Resources Division or *any other member of management*."  (Doc. No. 25-4 (emphasis added).)  Here, the record arguably supports a finding that Plaintiff's reporting to Denbowski meets the second portion of the policy.  There is testimony from both Plaintiff and Amoros suggesting that their relationship was strained such that Plaintiff may have found it "inappropriate" to go to Amoros with her complaints of sexual harassment.  (Doc. No. 33-3 at 30:24–31:8 (Plaintiff indicating that "she did not feel that she had an open line of communication with [Amoros], so [Denbowski] was [her] go to"); Doc. No. 25-9 (outside investigator reporting that Amoros said Plaintiff "did not like him").)  However, because Plaintiff has not made such an argument and because Plaintiff's failure to follow City policy is insignificant here, the Court need not make such a finding.

harassment.  But at the same time, as a member of management and pursuant to the City's own policy, Denbowski was obligated to report any information he learned concerning sexual harassment up the chain of command.  (Doc. No. 25-4 ("Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the Human Resources Division so it can be investigated in a timely and confidential manner.  The failure to report or investigate unlawful harassment by any supervisor is a serious offense and will result in disciplinary action, up to and including termination of employment."); *see also* March 7, 2023 Hr'g Tr. at 8:8–12 (counsel acknowledging that Denbowski may have violated the City's policy by not reporting Plaintiff's complaint).)  Indeed, the outside law firm who conducted the investigation into Rivera's conduct concluded that even despite Plaintiff's request to keep the text exchange secret, Denbowski's inaction "could be attributed to the City."  (Doc. No. 25-5 at 11.)  And other members of City management clearly thought that Denbowski was obligated to have handled Plaintiff's complaints in a different manner, given that City Solicitor Lachat reprimanded Denbowski for his failure to report this issue.  (Doc. No. 25-8 at 9:13–10:8 ("I essentially reprimanded him . . . on reporting; it doesn't matter what somebody tells you, even if it's the HR director, if they tell you don't share this with anybody, you know, he has an obligation to share that, and he understood.").)  Moreover, Amoros, as another member of City management, quickly reported Rivera's conduct despite facing a similar protest from Plaintiff that she did not want the Mayor to know.  (Doc. No. 33-2 at 85:14–24.)  Given these competing considerations, the Court finds that Plaintiff has presented a triable issue as to the respondeat superior element of her hostile work environment claim.

\*\*\*

For these reasons, the Court finds that summary judgment on Plaintiff's hostile work environment claim is inappropriate and denies the City's motion on this ground.

### B.    Retaliation

The Court turns next to Plaintiff's claim for retaliation against both the City and Mayor Moran, first addressing the claim against the City before turning to whether Moran is entitled to qualified immunity.  Plaintiff alleges that she was terminated from her position as human resources director because she complained about Rivera's conduct and because she filed a charge with the EEOC related to the sexual harassment she endured.  (Doc. No. 1; Mar. 7, 2023 Hr'g Tr. at 19:6–20:1 (indicating that Plaintiff's complaint to Amoros and her EEOC charge were the protected conduct on which she premises her retaliation claim).)  However, for the reasons set forth below, the Court finds that Plaintiff's retaliation claim fails as a matter of law and that Moran is entitled to qualified immunity.

### 1.  Plaintiff's Retaliation Claim Against the City.

The Court first addresses Plaintiff's claim for retaliation against the City under Title VII and the PHRA.  Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  A claim for retaliation under this provision is governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  At the first step, the employee bears the burden of establishing a *prima facie* case of retaliation.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  This requires Plaintiff to show "(1) protected employee activity; (2) adverse

action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* (quoting *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002)). The plaintiff's burden at this stage is "not onerous," and is "easily met." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).

At the second step, "[i]f the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action." *Marra*, 497 F.3d at 300. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Bloch v. Mack Trucks, Inc.*, 240 F. Supp. 3d 365, 373 (E.D. Pa. 2017). Then finally, "[i]f the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Marra*, 497 F.3d at 300–01 (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)).

### a.  Plaintiff's Prima Facie Case of Retaliation

At the first step, the Court finds that Plaintiff has successfully established a *prima facie* case of retaliation. Defendants correctly concede that Plaintiff meets the first two elements of a *prima facie* case:  1) Plaintiff engaged in protected activity when she reported Rivera's misconduct to management and when she submitted her charge of discrimination with the EEOC (Doc. No. 25 at 24), and 2) she was then subjected to an adverse action when she was suspended and later terminated  (*Id.*). Defendants do, however, make a passing jab at whether Plaintiff has met the causation element. (*Id.*)  But Defendants' argument on this point is unconvincing.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015). Here, the record indicates that Plaintiff filed her charge with the EEOC on February 7, 2022 (Doc. Nos. 33-10, 33-19) and that Plaintiff received a letter placing her on administrative leave just two days later, on February 9, 2022 (Doc. No. 33-21).[19] A two day gap between the protected conduct and retaliatory action is "unusually suggestive" of retaliation. *See Zelinski v. Pa. State Police*, 108 F. App'x 700, 706 (3d Cir. 2004) ("A discharge occurring two days after a plaintiff filed an EEOC complaint is 'unusually suggestive.'") (quoting *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (holding that the temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity); *Mclaughlin v. Fisher*, 277 F. App'x 207, 219 (3d Cir. 2008) ("This Court has held that two days between a protected activity and an adverse action is 'unusually suggestive' of retaliatory motive . . . ."). Thus, the Court finds that Plaintiff has sufficiently established a *prima facie* case of retaliation.

### b. Defendant's Legitimate Non-Retaliatory Purpose

Because Plaintiff has established a *prima facie* case of retaliation, the burden shifts to Defendants to "articulate some legitimate, non-retaliatory reason" for Plaintiff's termination. *Marra*, 497 F.3d at 300. Plaintiff does not contest that Defendants have met their burden here:

---

[19] In fact, while Plaintiff did not receive the letter until February 9, 2022, when it was handed to her in person, as discussed above, the letter itself is dated February 7, 2022, and notes that it was sent via email. (Doc. No. 33-21.) This suggests that Plaintiff may have been placed on administrative leave the exact day that she filed her charge. However, because the parties could not confirm whether the letter was in fact sent via email on February 7, 2022, the Court uses the February 9, 2022 date. (March 7, 2023 Hr'ing Tr. at 21:11–22:17.)

Defendants contend that Plaintiff was terminated because an outside investigation sustained allegations of her committing misconduct and violating City policies.  (Doc. No. 25 at 24; Doc. No. 36 at 13–14); *see also McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment.").  For ease of reference, the Court reiterates that the outside investigation sustained the following allegations of misconduct:

- A series of documented instances of misrepresenting and outright [sic] lying to City Officials, including a false allegation made by email and reiterated to City Council at a public meeting that one of [Acevedo's] subordinates – and not Acevedo – was responsible for payroll records being withheld from the City Auditor

- Demeaning, unprofessional, and hostile communications with [her] staff and other City officials;

- Failure to complete assigned tasks including critical aspects of internal investigations;

- Disregarding the legal advice of the City Solicitor and others, including an instance where [Acevedo] instructed the payroll coordinator to withhold records from the City Auditor and a second instance where [Acevedo] instructed the payroll coordinator to withhold salary increases to several City employees;

- Insubordination, and specifically, failure to comply with Moran's written directive that [Acevedo] forward complaints to the Law Department; and

- Engaging outside counsel without authorization and engaging outside counsel for assignment designed to undermine the authority of the Managing Director and Finance Director.

(Doc. No. 33-21 (the letter Plaintiff received); Doc. No. 25-9 at 7–15 (the investigative report findings).)[20]  The Court finds that this outside investigator's report satisfies Defendants' burden.

### c.  Pretext

Given that Defendants have set forth a legitimate justification for Plaintiff's termination, the burden returns to Plaintiff to show that this proffered reason was pretextual.

To demonstrate pretext, Plaintiff must present evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Johnson v. Phila. Hous. Auth.*, 218 F. Supp. 3d 424, 433 (E.D. Pa. 2016) (providing that a plaintiff seeking to rebut the employer's proffered legitimate reasons must present evidence that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action").

"To establish pretext by the first *Fuentes* prong, [Plaintiff] must show 'weaknesses, implausibilities, incoherencies, or contradictions' in [Defendants'] proffered reason '[such] that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 646 (E.D. Pa. 2021) (emphasis in original) (quoting *Fuentes*, 32 F.3d at 765).  On the other hand, to establish pretext by the second *Fuentes* prong, Plaintiff "must point to sufficient evidence that, notwithstanding [Defendants'] stated reason for the adverse action, 'an invidious discriminatory reason' actually caused the action." *Id*.  It is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken."

---

[20] There was an additional allegation that that Plaintiff "fail[ed] to comply with [Mayor Moran's] written directive that [she] forward complaints to the Law Department," (Doc. No. 33-21), but the outside investigation did not find sufficient evidence related to this alleged misconduct (Doc. No. 25-9 at 13). *See supra* at 20.

*Johnson*, 218 F. Supp. 3d at 433.  After all, the Court does "not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," Title VII does not interfere.  *Bloch*, 240 F. Supp. 3d at 374 (quoting *Murphy v. Ctr. for Emergency Med. of W. Pa*, 944 F. Supp. 2d 406, 435 (W.D. Pa. 2013)).  Applying this test to the issue at bar, Plaintiff must show that Defendants did not truly rely on the outside investigation, and instead terminated Plaintiff as retaliation for her protected conduct.  As another decision from this district stated, "Plaintiff must prove that [Defendant] believed its own investigation into [Plaintiff's] actions was incorrect and that its real motives were [retaliatory].  It is not enough for Plaintiff to argue that [she] did not violate company policy, or that [Defendant's] investigation into [her] conduct was flawed." *Id.*

Plaintiff does not contest that this is the appropriate test to apply in circumstances where an outside investigation was commissioned to determine whether an employee committed misconduct.  (Doc. No. 36 at 15.)  And Plaintiff is not arguing that the McNees law firm was not independent or that the investigation they conducted was otherwise improper.  (Mar. 7, 2023 Hr'g Tr. at 24:8–14, 28:6–19.)  Rather, she argues that the allegations of misconduct against her were baseless and that a jury could reasonably conclude that Mayor Moran's purported reliance on the outside investigator's report was disingenuous because he knew its findings were false. (Doc. No. 36 at 15–16; Doc. 42 at 4.)  Plaintiff claims that Moran knew the investigation's findings were false because Moran experienced the underlying conduct firsthand, and that he and his close aides (Lachat and Amoros) were the ones who made up the allegations in the first place. (Doc. No. 36 at 15–16; Doc. 42 at 4.)  In other words, Plaintiff argues that because it was Mayor Moran and his top aides who "drummed up" these "phony" allegations, Moran knew they were

false and thus cannot rely on the outside investigation's findings to shield against pretext.  (Mar. 7, 2023 Hr'g Tr. at 31:10–15; Doc. No. 42 at 4 n.3.)  Plaintiff's argument, while creative, is not supported by the record.

As an initial matter, the record, even when viewed in the light most favorable to Plaintiff, does not support Plaintiff's theory that Moran and his top aides concocted allegations to retaliate against her for her protected activity.  Plaintiff appears to overlook the fact that through her own testimony and written response to the outside investigator, Plaintiff admits to some of the underlying conduct.[21]  For example, Plaintiff informed investigators and testified during her deposition that she did in fact disregard Lachat's advice regarding the withholding of salary increases for City employees because she thought Lachat's advice was inconsistent with the Personnel Code and she did not feel comfortable following it without a written directive from Mayor Moran.  (*See* Doc. No. 33-22 at 3; Doc. No. 33-2 at 219:4–221:3.)  And Plaintiff admitted in her written response to the investigator that she had "verbally admonished" some of her subordinates and that she had a confrontational email exchange with a member of the police department on at least one occasion.  (Doc. No. 33-22 at 2.)  Finally, in connection with the allegation that she blamed her subordinate for failing to provide the required documentation to the City Auditor, Plaintiff admitted in her written response that, during a City Council meeting, she stated that the payroll administrator "took responsibility" for the payroll documentation not

---

[21] Plaintiff attaches a self-serving affidavit to her motion that states: "[e]ach of one [sic] of those allegations in the 2/7/22 suspension letter is false.  I misrepresented nothing to City officials and made no false allegations about any of my subordinates.  My communications were proper."  (Doc. No. 33-14 at ¶ 9.)  The Court does not credit these conclusory assertions.  *See Schaar*, 732 F. Supp. 2d at 493 ("[T]he non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion."); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.").  Instead, the Court examines the record as whole, viewing the facts in the light most favorable to plaintiff, the non-moving party.

being sent.  (Doc. No. 33-22 at 1.)  The Court accepts for purposes of this motion that Plaintiff's justifications for this conduct are valid, but the record shows at the very least that the incidents at issue occurred.  This undercuts any assertion by Plaintiff that these allegations were drummed up or pulled out of thin air.

Further, even assuming that all these allegations were entirely baseless, there is no evidence that Moran, as the decisionmaker, knew this to be the case.  (Doc. No. 25-8 at 19:4–8 (indicating that it was the Mayor's decision to terminate Plaintiff).)  The record does not support Plaintiff's argument that Moran experienced the underlying conduct firsthand and thus must have known the allegations were false.  (Doc. No. 36 at 16.)  For example, Plaintiff fails to point to any evidence that Mayor Moran was aware of the issue regarding whether the payroll backup documentation was provided to the City Auditor or that Moran was present for the Plaintiff's purportedly accusatory statements during the City Council meeting.  Instead, when explaining her actions leading up to and after the City Council meeting to the investigator, Plaintiff describes email correspondence with the managing director, the city auditor, the city solicitor, and the payroll administrator.  (Doc. No. 33-22.)  Conspicuously missing from this list of people is Mayor Moran.  Similarly, there is nothing to suggest that the Mayor was personally aware of Plaintiff's communications with her subordinates and others around City Hall such that he would have known the allegation of Plaintiff having hostile communications with her staff was baseless, as Plaintiff alleges.

The only issue that Mayor Moran appears to have firsthand knowledge of is the allegation regarding Plaintiff's retention of a labor lawyer.[22]  Viewing the evidence in the light most

---

[22] Indeed, when pressed at oral argument, this was the only example that Plaintiff's counsel could provide. (Mar. 7, 2023 Hr'g Tr. at 27:2–16.)

favorable to Plaintiff, there is evidence that Moran gave Plaintiff authorization to retain outside counsel to help resolve discrepancies with the Personnel Code.  (Doc. No. 38 at ¶ 83; Doc. No. 43 at ¶ 83; Doc. No. 33-2 at 189:24–119:17.)  Thus, Moran knew that Plaintiff did not take this action "without authorization" as his letter suggests.  (Doc. No. 33-21.)  But Moran knowing that this singular allegation was mistaken does not create a reasonable inference that he knew all the other allegations were similarly inaccurate.[23]  *See Trivette v. Walmart Stores, Inc.*, No. CV 0:17-3195-JMC-SVH, 2019 WL 13260536, at *11 (D.S.C. July 25, 2019) (providing that the decisionmaker's "knowledge of one inaccuracy in the Report does not show pretext alone").

In sum, Plaintiff has not and cannot point to any evidence in the record creating a reasonable inference that Moran had firsthand knowledge of the conduct underlying Plaintiff's alleged misconduct such that he could not rely on the outside investigator's report.[24]

Alternatively, Plaintiff alleges that Moran knew the allegations were false because his top aides, Lachat and Amoros, made up these allegations in the first place.  (Doc. No. 36 at 15–16.)

---

[23] Significantly, the issue raised by the City was not only that Plaintiff retained outside counsel without authorization, but that she used this labor lawyer for an improper and unauthorized purpose, namely to reroute the chain of command so that she could report directly to the Mayor.  (Doc. No. 33-21 (letter to Plaintiff alleging that she had "engag[ed] outside counsel for assignment designed to undermine the authority of the Managing Director and Finance Director").)  The outside investigator agreed that Plaintiff was authorized to retain a labor lawyer, but nevertheless sustained the allegation against her because she used that lawyer for an improper purpose.  (Doc. No. 25-9 at 14 ("The facts uncovered as part of this investigation reflect that [Plaintiff] is correct insofar as she was given permission to engage outside counsel for general labor matters.  However, [Plaintiff] instead attempted to utilize outside counsel, Matthew Connell, Esq., to assist her in altering the reporting chain of the Human Resources Department to report directly to the Mayor and to avoid any further reporting to the Managing Director — not for general labor matters as stated.").  And there is no evidence that Mayor Moran had any firsthand involvement in Plaintiff's discussions with outside counsel such that he would have known whether she was using counsel for the agreed upon purpose.

[24] And even if Moran had some involvement in the underlying conduct, that does not necessarily mean that he was so attuned to the issues that he knew the allegations against Plaintiff were baseless and that he could not reasonably rely on a thorough outside investigation that found Plaintiff had in fact committed misconduct.

As an initial matter, while it is true that at least some of the complaints came from Lachat, (Doc. No. 25-8 at 17:12–18), the record does not support the claim that every issue raised in Plaintiff's suspension letter came from these two individuals.  But even if they had, Plaintiff again fails to explain how this shows that Moran, who was the decisionmaker, knew the allegations raised by his aides were false.  To the extent Plaintiff asks the Court to impute their knowledge to Moran based solely on their stature at City Hall, the Court finds that inference unreasonable.[25]

While Plaintiff argues that Moran and his top aides worked together to concoct false allegations of misconduct against Plaintiff, this grand conspiracy is not supported by the record. Instead, the record shows when faced with complaints that Plaintiff had violated City policy, Moran retained outside counsel to investigate the allegations.  (*See* Doc. No. 25-8 at 19:14–20:16 (indicating that outside counsel was hired to remove any bias that they may have had from being too close to Plaintiff and her conduct).)  This outside investigator, the very same investigator that Moran and the City hired to examine Plaintiff's allegations against Rivera, conducted a robust review and concluded that Plaintiff had in fact violated City policies.  (Doc. No. 25-9.)  Moran and the investigator may very well have been wrong in concluding that Plaintiff committed any sort of misconduct and Moran may have mistakenly fired Plaintiff.  But again, the Court is not a "super-personnel department," and our inquiry is not whether Moran made the right decision, but rather, whether he fired Plaintiff *because of her protected activity*.  *Bloch*, 240 F. Supp. 3d at 374; *Fuentes*, 32 F.3d at 765 (providing that to rebut pre-text it is not enough to "simply show that the employer's decision was wrong or mistaken").  And without any evidence that Moran knew or had reason to believe that the outside investigator's findings were false or that the report

---

[25] If anything, the fact that these aides were involved in the underlying conduct justifies why an outside investigator was necessary:  to allow Moran to make a decision without any bias caused by his aides' involvement.

was glaringly unreliable or improper, *see Kowalski v. L & F Prod.*, 82 F.3d 1283, 1290 (3d Cir.

1996) ("The facial accuracy and reliability of the report is probative of whether [defendant] acted

in good faith reliance upon the report's conclusions."), Moran's reliance on the report prevents a

reasonable jury from finding that Plaintiff's termination was retaliatory.[26]  *See Bloch*, 240 F.

Supp. 3d at 374 (granting summary judgment where there was no evidence that the defendant

"believed its own investigation into [the plaintiff's] actions was incorrect and that its real

motives were discriminatory");  *Barron v. Abington Township*, No. CV 20-5763, 2022 WL

945711, at *7 (E.D. Pa. Mar. 30, 2022) ("Because the evidence suggests that Manfredi

reasonably relied upon McLaughlin's report in deciding to terminate Plaintiff's employment and

because Plaintiff has pointed to no 'weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions' in Defendants' reasons for their actions that would allow a reasonable

factfinder to conclude that they were a pretext for gender discrimination, the Court will grant

Defendants' motion for summary judgment with respect to Plaintiff's claims for gender

discrimination under Title VII and the PHRA.");  *Barney v. Consol. Edison Co. of N.Y.*, No.

CV99-823DGTSMG, 2009 WL 6551494, at *14–15 (E.D.N.Y. Oct. 1, 2009), *aff'd*, 391 F.

App'x 993 (2d Cir. 2010) (noting that plaintiff faced an "uphill battle" because the

---

[26] At oral argument, Plaintiff suggested that the outside investigation was potentially tainted by the involvement of the Mayor's top aides.  (Mar. 7, 2023 Hr'g Tr. at 24:18–22; 29:24–30:6 (stating that "the investigation is only as good as the information or the reliability of the information given" and that its "not necessarily the case that the investigator doing an independent, fair, impartial investigation is going to find that the Mayor's report or what Lachat said to the investigator or what Amoros said to the investigator are going to be false").)  But it does not appear that Lachat was interviewed as a part of the outside investigation.  (Doc. No. 25-9 at 2 (indicating investigation interviewees).)  And the Court finds significant that at the time of the report, Amoros was no longer employed by the City and had no involvement in the decision to suspend or terminate Plaintiff.  (Doc. No. 33-9 at 33:5–14.)  Thus, Plaintiff's assertion is baseless.  If anything, the fact that the outside investigation sustained most of the allegations of misconduct even despite Lachat not being involved and Amoros no longer being employed as the Mayor's close aide provides additional support to the report's reliability and Moran's reliance on it.

decisionmaker relied on an independent investigation in deciding to fire her).  The Court grants
summary judgment to the City as to this claim.

### 2.  Plaintiff's Claim against Moran and Qualified Immunity

The Court turns next to Plaintiff's claim against Mayor Moran under § 1983 for violation
of her equal protection rights in the form of retaliation and finds that Moran is entitled to
qualified immunity.  Qualified immunity prevents lawsuits against government officials to
"shield" them "from harassment, distraction, and liability when they perform their duties
reasonably." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 168 (3d Cir.
2016).  "When properly applied, it protects all but the plainly incompetent or those who
knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (internal quotation
marks omitted).  "Qualified immunity shields federal and state officials from money damages
unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional
right, and (2) that the right was 'clearly established' at the time of the challenged conduct."
*Mirabella v. Villard*, 853 F.3d 641, 648 (3d Cir. 2017).

Here, Plaintiff's claim against Moran under § 1983 is premised on the same retaliatory
conduct discussed above:  Moran purportedly terminating Plaintiff's employment because she
lodged her complaints about Rivera's conduct and because she filed a charge with the EEOC.[27]

---

[27] Despite asserting that Moran's conduct violated her right to equal protection, Plaintiff's claim appears
to be centered on his violation of her right under Title VII to be free from retaliation.  (*See* Doc. No. 36 at
16 ("Plaintiff's Section 1983 claim against Moran in his individual capacity is predicated on his firing her
in retaliation for her protected activity in opposing sexual harassment."); *id.* at 18 (Plaintiff arguing that
the "clearly established" right that Moran violated was Title VII's right to be free from retaliation).  While
neither party raised the issue, the Court notes that numerous opinions have held that a § 1983 claim
premised on retaliation in violation of Title VII cannot stand.  *See Stevens v. City of Philadelphia*, No. CV
17-4853, 2018 WL 3328057, at *3 (E.D. Pa. July 6, 2018) ("The Court dismisses plaintiffs' § 1983 claim
on the ground that courts in this circuit have not recognized retaliation claims under § 1983."); *Blakney v.
City of Philadelphia*, No. CIV.A. 12-6300, 2013 WL 2411409, at *12 (E.D. Pa. June 4, 2013), *aff'd*, 559
F. App'x 183 (3d Cir. 2014) ("Employment discrimination claims that are based solely on theories of
unlawful retaliation—which exist under Title VII and are not recognized under constitutional principles—
may not be pursued via § 1983."); *Slaughter v. County of Allegheny*, No. 2:11-CV-880, 2013 WL

However, as set forth above, Plaintiff has failed to set forth a viable claim for retaliation because

Defendants have shown that they terminated Plaintiff as the result of an outside investigation

sustaining numerous allegations of misconduct, not because of her protected activity.  *See supra*

at 38–45.   And because Plaintiff has failed to set forth a constitutional or statutory violation on

the part of Mayor Moran, he is entitled to qualified immunity and the Court need not reach the

second step of the analysis.  *See Mitchell v. Obrie*n, No. CV 16-3556, 2017 WL 3841634, at *4

(E.D. Pa. Sept. 1, 2017) ("Here, with regard to the first prong, because I have concluded that no

constitutional violation was committed by the defendants, they are entitled to qualified immunity

and dismissal of the constitutional claim against them.  I note that I am not required to analyze

the second step of the qualified immunity test under *Saucier* if no constitutional violation

occurred.  As the Supreme Court stated, '[i]f, and only if, the court finds a violation of a

constitutional right,' the court moves to the second step of the qualified immunity analysis.");

*James v. City of Wilkes-Barre*, 700 F.3d 675, 682 (3d Cir. 2012) ("Having found no

constitutional violation, we hold that [the defendant] is entitled to qualified immunity.").

### C.   Sexual Harassment Claim Against Rivera

Last, the Court turns to Plaintiff's § 1983 claim against Rivera for sexual harassment.

For the reasons discussed below, the Court finds that Rivera is entitled to summary judgment on

---

5491739, at *8 (W.D. Pa. Oct. 1, 2013) ("[A]n employee cannot pursue retaliation claims against his
supervisors under § 1983."); *Braddock v. SEPTA*, No. CIV.A. 13-06171, 2014 WL 2764862, at *5 (E.D.
Pa. June 18, 2014) ("[A] substantial body of persuasive case law supports a finding that plaintiff is
precluded from bringing his § 1983 claim for retaliation because he has not sufficiently pled a claim for
discrimination under the Equal Protection Clause or other conduct that violated the Constitution or any
federal law other than the retaliation provision of Title VII."); *Price v. Del. Dep't of Corr.*, 40 F. Supp. 2d
544, 558 (D. Del. 1999) (holding that "[a] claim of retaliation cannot be the sole basis for a § 1983 claim
where there is no violation of the Constitution or federal law, other than the retaliation provision of Title
VII" and finding this principle consistent the Third Circuit's holding that individuals cannot be held liable
under Title VII).  Thus, while the Court need not reach this issue, we note that this is an independent basis
for dismissing Plaintiff's claim against Moran.

this claim because the undisputed evidence shows that Rivera was not acting under the color of state law when he harassed Plaintiff.

In order to state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Rivera's challenge focuses on the latter component: whether he was acting under the color of state law when he sexually harassed Plaintiff. (Doc. No. 23-4.) "A finding of liability under 42 U.S.C. § 1983 requires that the defendant have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Bonenberger v. Plymouth Township*, 132 F.3d 20, 23 (3d Cir. 1997) (internal quotation marks omitted and alterations accepted). Put another way, "the essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Id.* at 24. Applying this principle to the context of a state employee alleging harassment from a colleague, determining whether a harasser is acting under the color of state law turns on whether the individual was in a supervisory position to the plaintiff. *See id.* at 24–25 ("If a state entity places an official in the position of supervising a lesser-ranking employee . . . that official wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983."); *Zelinski*, 108 F. App'x at 703 ("Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position in relation to the plaintiff.").[28]

---

[28] Plaintiff agrees that this is the appropriate test to apply in these circumstances. (*See* Doc. No. 26 at 21 n.5 ("As Rivera tells the Court, '[t]he precedent in both the Third Circuit and other Circuits require[s] that a defendant have some authority over the plaintiff, and abuse that authority, in order for their to be 'action under color of law' sufficient to give rise to liability under 42 U.S.C. § 1983.' Plaintiff concurs . . . .").)

However, an individual's titles or official responsibilities are not dispositive of whether a harasser had supervisory authority over the plaintiff. *See Bonenberger*, 132 F.3d at 23 ("There is simply no plausible justification for distinguishing between abuse of state authority by one who holds the formal title of supervisor, on the one hand, and abuse of state authority by one who bears no such title but whose regular duties nonetheless include a virtually identical supervisory role, on the other."); *Zelinski*, 108 F. App'x at 703 ("The fact that [defendant] was not [plaintiff's] formal supervisor at the time of the harassment, however, is not dispositive."). Rather, the Court must look to the individual defendant's "job functions" rather than their "form," to determine whether that defendant was acting as a *de facto* supervisor. *Zelinski*, 108 F. App'x at 703. The "two primary factors" the Third Circuit has focused on in determining whether an employee has such *de facto* authority is "1) whether the defendant could alter the plaintiff's workload, and 2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order." *Id.*

Here, Plaintiff concedes that Rivera was not her official supervisor and that he had no official oversight over the human resources department. (Doc. No. 35 at ¶ 30; Doc. No. 36 at 18.) She further concedes that Rivera had no official authority to discipline, terminate, or assign or remove duties from her. (Doc. No. 35 at ¶¶ 31–32; Doc. No. 36 at 18–19.) She argues, however, that because of Rivera's close relationship with Mayor Moran, he had *de facto* supervisory authority over Plaintiff in her role as human resources director. (Doc. No. 36 at 19–20.) In support of this argument Plaintiff points to a variety of ways in which Rivera's relationship with Mayor Moran purportedly cloaked Rivera with power, including among other things, Moran's public tributes to Rivera, that Rivera would attend constituent or City Council meetings on the Mayor's behalf, that Rivera would "chime in" with his opinion on policy issues,

that Rivera occasionally drove the Mayor in his car, and that Rivera on one occasion made a purchase with the Mayor's credit card.  (Doc. No. 36 at 20–21.)  Plaintiff also points to a statement Denbowski made that Rivera thinks he "can do and say whatever he wants to."  (Doc. No. 33-2 at 108:16–24.)[29, 30]

However, even viewing the evidence in the light most favorable to Plaintiff, she has not presented a triable issue as to whether Rivera had *de facto* supervisory authority over *her*.  The record presented by Plaintiff shows that Rivera and Moran shared a close friendship, and that Rivera may have had additional pull at City Hall because of this friendship.  Critically, however, Plaintiff has not presented any evidence that this friendship ever gave Rivera authority *over Plaintiff*.  Put another way, to show that Rivera acted under the color of state law and avoid summary judgment, Plaintiff needs to put forth evidence that Rivera had supervisory authority over *her*, not that he had authority in City Hall in general or over other employees.  Plaintiff does not cite to any instances where Rivera directly or indirectly affected Plaintiff's workload, caused her to be punished or disciplined, or otherwise ordered Plaintiff to conduct herself in a certain way at risk of being charged with insubordination.[31]  Rather, as numerous witnesses testified,

---

[29] Plaintiff's brief misconstrues her own testimony and claims that Denbowski told her that Rivera could in fact "do and say whatever he wants."  (Doc. No. 36 at 20.)  However, Plaintiff's testimony was that Rivera "thinks" he can do and say whatever he wants, not that Denbowski also thought this was the case. (*See* Doc. No. 33-2 at 108:16–21 ("[Rivera] thinks he's above everyone and that he can do and say whatever he wants to.").)  This is a subtle, but important distinction.

[30] Plaintiff repeatedly asserts that her supervisor, Amoros, admitted that "Rivera was in a position to influence Moran's decisions."  (Doc. No. 36 at 21; Doc. No. 41 at 2.)  Plaintiff imprudently misreads Amoros's testimony, which in truth reads that Rivera was "in [a] position to talk to anybody, including the Mayor."  (Doc. No. 33-9 at 39:15–20.)  This proposition is unsurprising given that he was the Mayor's assistant.  And that Rivera could talk to the Mayor hardly presents an inference that he had *de facto* supervisory authority over Plaintiff.

[31] Rivera was present at one of Plaintiff's interviews for the position in 2020.  (Doc. No. 33-2 at 30:7–9.)  But as Plaintiff acknowledged, he never asked questions and only introduced himself.  (*Id.* at 30:14–19, 271:22–272:8.)  His mere presence at her interview fails to support an inference that Rivera had supervisory authority over Plaintiff.

Rivera was largely siloed off from the human resources department.  (Doc. No. 33-3 at 76:16–77:16 (Plaintiff testifying that Rivera had no authority over her); Doc. No. 33-9 at 35:22–36:11 (Amoros testifying to the same); Doc. No. 33-7 at 38:13–39:2 (Moran testifying that Rivera "absolutely" did not have oversight over human resources, and had no authority to discipline, fire or assign or remove duties from Plaintiff).)  And while Plaintiff asserts that Rivera's close relationship with Moran meant he *could have* exercised such authority over Plaintiff, her bald speculation does not create an issue of fact sufficient to ward off summary judgment.[32]  *See McCans v. City of Truth or Consequences*, No. 07-CV-0606 BB/LCS, 2008 WL 11359163, at *8 (D.N.M. Nov. 4, 2008), *aff'd*, 360 F. App'x 964 (10th Cir. 2010) (holding that plaintiffs' argument that the defendant's friendship with their supervisor gave him an air of authority, was "insufficient to create a supervisory relationship" and that "[e]quating mere association with a supervisor to supervisory authority" is too far of a stretch); *Gorton v. Gettel*, No. 04 CIV.0236 SCR, 2007 WL 2154193, at *2 (S.D.N.Y. June 22, 2007) ("In addition, Plaintiff's argument that Gettel was friendly with Jordan, and that this relationship turned his conduct into state action is equally unconvincing since there is no evidence, or even an allegation that this friendship or any power supposedly derived from it resulted in or from any authority conferred by the state."); *cf. Shaw v. Temple Univ.*, 357 F. Supp. 3d 461, 474 (E.D. Pa. 2019) (finding summary judgment

---

[32] Plaintiff's counsel argued at oral argument that even if Rivera never exercised authority over Plaintiff, she perceived that he could, and that this perception is significant.  (March 7, 2023 Hr'g Tr. at 43:11–45:19.)  But this argument is misguided from both a legal and factual basis.  First, Plaintiff's subjective view on whether Rivera had supervisory authority is not determinative of the issue.  *See Washington-Pope v. City of Philadelphia*, 979 F. Supp. 2d 544, 568 (E.D. Pa. 2013) ("None of this is to say that a victim's subjective perceptions are the test for determining whether an officer acted under color of law."); *Strange v. Porath*, 104 F.3d 368 (10th Cir. 1996) ("The under color of law determination does not turn on an individual's subjective understanding of an actor's conduct.").  And second, the record shows that Plaintiff did not take Rivera seriously and instead viewed him as immature.  (Doc. No. 33-2 at 139:9–12; Doc. No. 33-3 at 72:12–24.)

appropriate despite the plaintiffs' speculation that their supervisors changed the plaintiffs' shifts because of the supervisor's friendship with the defendant).[33]

Grasping for straws, Plaintiff argues that Rivera was clothed in state authority because he made sexualized comments to Plaintiff on behalf of Mayor Moran.  (Doc. No. 36 at 20; Doc. No. 41 at 2.)  It is true that Rivera asked Plaintiff if she knew anyone willing to go on a date with the Mayor for $30,000 and told Plaintiff at the Latino convention that the Mayor wanted to "fuck" her.  (Doc. No. 38 at ¶¶ 38, 52; Doc. No. 43 at ¶¶ 38, 52.)  However, there is no evidence that Moran asked Rivera to make such comments or even knew what Rivera had said.  And perhaps even more significantly, Plaintiff herself disavowed any belief that Rivera was being serious about Moran's desires, believing instead that he was joking or trying to ferret out her interest in him.  (Doc. No. 33-2 at 208:10–15, 210:11–211:16.)  The Court cannot find that Rivera was imbued with Moran's authority on such a record.

Given the lack of evidence from which a jury could reasonably infer that Rivera had the authority to affect the conditions of Plaintiff's employment, the Court cannot find that Rivera was Plaintiff's *de facto* supervisor and must grant Rivera summary judgment as to this claim.

---

[33] In support of her argument that Rivera's relationship with Moran was sufficient to cloak him with the power of the state, Plaintiff relies on the Third Circuit's opinion in *Bonenberger v. Plymouth Township*, 132 F.3d 20 (3d Cir. 1997) and an opinion from the Western District of New York that *Bonenberger* cites, *Poulsen v. City of North Tonawanda*, 811 F. Supp. 884 (W.D.N.Y. 1993).  (Doc. No. 36 at 18–19; March 7, 2023 Hr'g Tr. at 41:18–43:12.)  But neither case stands for the proposition that a defendant can be found to have acted under the color of state law even where they have never exercised authority over their victim.  Instead, in *Bonenberger*, while the defendant was not technically plaintiff's supervisor, the Third Circuit found there was evidence that the defendant would occasionally supervise the plaintiff and that the defendant could alter the plaintiff's workload or have her charged with insubordination if she failed to follow his orders.  132 F.3d at 24.  Thus, the court found that there was a factual dispute over whether the defendant had supervisory authority such that summary judgment was inappropriate.  *Id.* at 25.  Similarly, in *Poulson*, there was competing evidence as to the defendant's "authority over daily assignments and performance evaluations," which prevented the entry of summary judgment.  811 F. Supp. at 895.  Here, on the other hand, the evidence that Rivera's authority was greater than on paper is suspect, and there is no evidence that he ever used whatever authority his special relationship with Moran conferred over Plaintiff.

*See Zelinski*, 108 F. App'x at 703 (affirming the grant of summary judgment for harassment claim because there was no evidence that the defendant could alter the plaintiff's workload or that she would be charged with insubordination for disregarding his orders); *Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 428 (E.D. Pa. 2014) (granting summary judgment for § 1983 harassment claim where despite behaving like he was plaintiffs' supervisor, there was "nothing in the record to support a finding that [defendant's] regular duties included a virtually identical supervisory role"); *Shaw*, 357 F. Supp. 3d at 473 (granting summary judgment for § 1983 harassment claim where there was no evidence that the defendant had authority over their workloads and finding the defendants' use of his "clout" to effect other behavior in the workplace to have "absolutely nothing to do with [the defendant's] supervisory authority over Plaintiffs").

## IV.      Conclusion

For the reasons set forth above, the Court denies the City's motion for summary judgment as to Plaintiff's hostile work environment claim under Title VII and the PHRA.  The Court grants the City and Mayor Moran's motion for summary judgment as to Plaintiff's retaliation claims under Title VII, the PHRA, and § 1983.  The Court also grants Rivera's motion for summary judgment.  An appropriate order follows.