**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AIDA ACEVEDO**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-1224-KSM** |
| **CITY OF READING, et al.**, | |
| Defendants. | |

**MEMORANDUM**

MARSTON, J.                                        September 27, 2024

Aida Acevedo, the former human resources director for the City of Reading ("the City"), has brought a claim for hostile work environment against the City premised on sexual harassment she endured at the hands of Mayor Eddie Moran's special assistant, Nathanael ("Nate") Rivera. (Doc. Nos. 1, 59.) Following a three-day trial, the jury returned a verdict in favor of the City. (Doc. No. 83.) Plaintiff has now filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), premised on the Court's purportedly erroneous ruling on a hearsay objection from the City. (Doc. No. 90.) For the reasons set forth below the Court will deny Plaintiff's motion.

I.      **Factual Background**

The relevant facts, as elicited at trial, are as follows:

A.      **Rivera and Plaintiff Meet and Plaintiff Begins Her Position with the City**

This case centers around the sexual harassment Plaintiff purportedly endured at the hands of Nate Rivera. Plaintiff was first introduced to Rivera in November of 2019, before she began

working for the City, through a mutual friend, Elsie Maduro.[1]  (May 7, 2024 Trial Tr. ("Day 1")

at 78–79; Day 2 at 26–27.)  As Rivera explained to Plaintiff, he was, at the time, assisting Eddie

Moran with his mayoral campaign and was going to be a part of Moran's administration once he

was in office.  (Day 2 at 28–29.)  Rivera and Mayor Moran first met in 2011 through volunteer

opportunities with the Reading School District and shortly thereafter developed a close

friendship.  (Day 1 at 64–70, 102–03 (Rivera testifying about his friendship with Mayor Moran).

*But see* May 9, 2024 Trial Tr. ("Day 3") at 36 (Moran testifying that he met Rivera in 2016).)

Moran was eventually elected as Mayor and hired Rivera to act as his special assistant.  (Day 1 at

71–74; Day 3 at 38.)  In this position, Rivera reported to the City's chief of staff, the late Frank

Denbowski.[2]  (Day 1 at 77.)

 In October of 2020, roughly a year after Mayor Moran was elected (Day 3 at 34, 41

(Moran testifying that he was first elected in fall of 2019 and inaugurated in January of 2020)),

Plaintiff applied for the position of human resources director for the City (Day 2 at 19, 29).[3]

After submitting her application, Plaintiff received Rivera's phone number from Maduro.  (*Id.* at

29.)  Plaintiff texted Rivera and later spoke with him on the phone, informing him that she

---

[1] Plaintiff was living in southwest Florida but had previously lived in the Reading area and at this time, she was visiting her family for Thanksgiving.  (May 8, 2024 Trial Tr. ("Day 2") at 26.)

[2] Denbowski was undergoing chemotherapy during the events of this case.  (Day 2 at 251.)  Tragically, Denbowski passed away in January 2023.  (*Id.*); *see* David Kostival, Reading City Council Reacts to Death of Frank Denbowski, WFMZ, https://www.wfmz.com/news/area/berks/reading-city-council-reacts-to-death-of-frank-denbowski/article_c148a652-9082-11ed-bf44-171de7893c35.html (Jan. 9, 2023).

[3] The position had recently been created by a referendum changing the title from human resources manager to human resources director.  (Day 2 at 143.)  This change brought human resources directly under the supervision of the managing director and separated human resources from finances and the director of administrative services.  (*Id.* at 144.)

applied for the human resources director position. (*Id.* at 29, 75–76; Day 1 at 79 (Rivera); Ex. 41 at 1.)[4]

After several interviews, Plaintiff was ultimately offered the job and began her employment as the City's first human resources director on November 16, 2020. (Day 2 at 5.) In this position, Plaintiff reported to the City's then-managing director, Abe Amoros. (*Id.* at 71; Day 1 at 27.) Plaintiff's position was largely siloed from Rivera's, meaning that the two were not obligated to communicate to carry out the tasks of their respective roles. (Day 1 at 87–88 (Rivera testifying that Plaintiff didn't report to him and they didn't speak about work-related matters in his office); Day 2 at 224 (Plaintiff testifying that Rivera was not in her chain of command).)

### B.      Rivera's Sexual Harassment of Plaintiff

Plaintiff alleges that she endured four separate instances of sexual harassment at the hands of Nate Rivera during her employment with the City. (Day 2 at 175 (Plaintiff acknowledging that the scope of her harassment was four instances).) Plaintiff testified that these four instances, in aggregate, placed her in a "box" and reduced her back to trauma she faced as a child. (*Id.* at 88–89.) However, a review of the testimony and evidence presented at trial paints a different picture.

### 1.      The January 2021 Incidents

The first instance of sexual harassment occurred in January of 2021, just a few months after Plaintiff began her role as human resources director. (*Id.* at 76–77.) After Plaintiff began her tenure at City Hall, she and Rivera continued to exchange text messages and speak on the

---

[4] Trial Exhibit 41 consists of Rivera and Plaintiff's text messages, with Rivera's messages in blue and Plaintiff's in gray. (Day 1 at 114.) This exhibit was properly introduced at trial and published to the jury during both Rivera's and Plaintiff's testimony. (Day 2 at 74.) An identical copy of these texts were included as a part of the summary judgment record and can be found at docket entry 31.

phone.  (*See generally* Ex. 41.)  These conversations were typically about matters outside of their respective job responsibilities.  (Day 2 at 199–200 (Plaintiff testifying that the two gossiped about another City employee through their text messages)); *id.* at 200–01 (Plaintiff testifying that Rivera texted her in the middle of a City Council meeting saying "tu no mi quieres," meaning "you don't love me," and that Plaintiff responded, "Lol!! It's Aida")).  On January 12, 2021, Plaintiff received a text message from Rivera saying "se lo paro," which translates to "it went up," followed by a laughing emoji.  (*Id.* at 76–77; Ex. 41 at 5.)  Plaintiff had just left a meeting in which Mayor Moran gave her a hug, and thus she interpreted this text to mean that Mayor Moran had an erection.  (Day 2 at 77.)  Plaintiff testified that after seeing this text, she told Rivera that he was "out of control" and to not forget that she is human resources director.  (*Id.* at 78.)  According to Plaintiff, Rivera apologized and said that he was joking.  (*Id.*)

Then, around January 19, 2021, Plaintiff and Rivera were alone in his office while she waited for Denbowski to return for a meeting.  (*Id.* at 42–43, 204–05.)  Plaintiff would meet with Denbowski in his office two or three times per week, and when Denbowski was unavailable, she would often wait for him to return in Rivera's office.[5]  (*Id.* at 45–46, 170–72; *see also* Day 1 at 105 (Rivera testifying that "it was very constant" that Plaintiff would visit his office); *cf.* Day 3 at 77 (Maria Delgado, the Mayor's assistant, testifying that Plaintiff would often close the door to Rivera's office while visiting).)  Plaintiff estimated that this would occur one or two times per week (Day 2 at 170–72) and according to Rivera, these impromptu meetings took place throughout the pair's tenure at City Hall (Day 1 at 105–06).[6]  During this particular meeting,

---

[5] While one route to Denbowski's office required Plaintiff to pass thorough Rivera's office, there was also a back door that would have allowed her to bypass Rivera.  (Day 2 at 162; Day 3 at 76.)  Plaintiff, however, typically used the front door.  (Day 2 at 162.)

[6] Maria Delgado, Mayor Moran's assistant, testified that in addition to occasions where Plaintiff would wait in Rivera's office for Denbowski, there were also times where Plaintiff would come to the Mayor's

after having learned through conversations with Plaintiff and her friend, Maduro, that Plaintiff was single, Rivera offered to satisfy her sexual needs.  (Day 2 at 42–43; *see also* Day 1 at 81–82 (Rivera testifying that he may have said that to Plaintiff but that he was joking).)  According to Plaintiff, she responded by again telling Rivera to not forget that she is the human resources director, to not do it again, and that it was "very disrespectful."  (Day 2 at 43.)

Shortly thereafter, Plaintiff claims that she reported the incident to Denbowski.  (*Id.* at 44.  *But see* Day 1 at 40–41 (Lachat testifying that as far as he knew, Plaintiff did not report this incident to Denbowski).)  Plaintiff also informed Denbowski that she had already addressed the issue with Rivera.  (Day 2 at 45.)  In response, Denbowski acknowledged that Rivera was "out of control" and shook his head.  (*Id.* at 44.)  Plaintiff did not report this incident to Amoros, who was her supervisor, at the time.[7]  (Day 3 at 94–95.)

Plaintiff testified that after these incidents, and in particular the text message about the Mayor having an erection, she felt "degraded" and "disgusted."  (Day 2 at 77.  *But see id.* at 208–09 (Plaintiff testifying that she "was not disturbed at this time").)  She further testified that shortly after this incident, she began her attempts to see a cardiologist because she was feeling anxious about the way Rivera was treating her.  (*Id.* at 69.)  However, Plaintiff continued to text Rivera, with her messages seemingly striking a flirtatious tone.  (*Cf.* Day 3 at 45–46 (Moran testifying that he heard Rivera and Plaintiff had a flirtatious relationship).)  For example, on January 29, 2021, just ten days after Rivera purportedly offered to satisfy her sexual needs,

---

suite specifically looking for Rivera.  (Day 3 at 75–76.)  Delgado also testified that when she observed Rivera and Plaintiff in Rivera's office, they were often laughing and enjoying themselves.  (*Id.* at 77–78.)

[7] Plaintiff claims that she intended to raise these issues with Amoros during multiple meetings in February of 2021 but that the meetings ended before she was able to do so.  (Day 2 at 70–73, 191–92.)  Plaintiff testified that Amoros was busy and would often cut her short, preventing her from raising her concerns about Rivera.  (*Id.* at 191–92.)  However, Amoros testified that he and Plaintiff met twice a month and that he was always willing to extend time for his directors.  (Day 3 at 93, 95.)

Plaintiff texted Rivera seemingly out of the blue saying, "Nate, I wasn't flirting with you, I was being real." (Ex. 41 at 9; Day 2 at 208.) Rivera responded by saying, "Traquila mi amor," translating to "tranquil my love." (Ex. 41 at 9; Day 2 at 208.) Later that night, Plaintiff texted Rivera saying, "Stop flirting with other girls, I wanted to communicate with you but si no hablamos despues. Perdoname si no hice lo que pedistes," with the latter portion translating to, "but if not, it's okay, we'll talk later." (Ex. 41 at 10; Day 2 at 212.) Rivera then responded, "What happen? What U talking about?" to which Plaintiff replied, "Nada, thank you." (Ex. 41 at 10.) Rivera then sent an emoji of two eyes, to which Plaintiff responded, "Lol. You made ma [sic] laugh." (*Id.*; Day 2 at 213.) Rivera then said, "Hit me up after your [sic] done with the girls," to which Plaintiff responded, "Yea sure." (Ex. 41 at 10; Day 2 at 213.)

Later that same night, Plaintiff texted Rivera saying, "so you know Mildred?" to which Rivera responded, "Yea." (Ex. 41 at 12; Day 2 at 214.) Plaintiff then mirrored his response, saying "Yea," apparently insinuating that Rivera had been romantically involved with Mildred. (Ex. 41 at 12.) Rivera then responded, "[n]ot that way do lol," to which Plaintiff said, across three separate texts, "Ok. So what if you did, You are a grown man." (*Id.*; Day 2 at 214–15.) A few days later, Plaintiff texted Rivera saying, "Leave your girls be for minute." (Ex. 41 at 14; Day 2 at 215.) And then, on February 11, 2021, Plaintiff texted Rivera in Spanish, saying "I'm going to bite you" in reference to him making her wait for a call. (Ex. 41 at 16; Day 2 at 217.)

In addition to these more flirtatious texts, Plaintiff and Rivera gossiped about their coworkers, including Amoros and another City employee named Jamar. (Ex. 41 at 14–15.)

### 2.     The March 2021 Incident

The next purported instance of harassment occurred around March 11, 2021 when Plaintiff was again waiting for Denbowski in Rivera's office, notwithstanding Rivera's prior

6

inappropriate conduct.  (Day 2 at 45–46, 179–80, 219–22.)  Rivera stated to Plaintiff, in Spanish, "te lo quiero," meaning that that "he want[ed] to stick it in" her.  (*Id.* at 45–46; *see also* Day 1 at 82 (Rivera acknowledging that he at some point said he wanted to stick his dick in her).)  Rivera also told Plaintiff that Mayor Moran's wife was sick and that the Mayor hadn't had sex for approximately a year.  (Day 2 at 47.)  He asked Plaintiff if she knew anyone willing to have sex with Moran and that he was willing to pay $30,000 for it.  (*Id.*)  Plaintiff interpreted Rivera's question as soliciting her for sex with the Mayor, but she did not believe that the Moran was actually sexually or romantically interested in her.  (*Id.* at 47, 181.)  She again told Rivera to stop, that he was being inappropriate, and to not forget that she was the human resources director.  (*Id.* at 49, 180–81.)  Plaintiff reported this incident to Denbowski that same day (*id.* at 49), but, again, did not report it to Amoros at the time (Day 3 at 94–95).

Plaintiff testified that while she still felt like she was in control of herself at the time of this incident, Rivera's comments, when paired with the January incidents, created a sexually hostile work environment for her.  (Day 2 at 225.)  But again, even after this inappropriate conduct, Plaintiff continued to text and speak on the phone with Rivera in a friendly manner, including the day after he purportedly made the March 11 comments.  (*Id.* at 226; Ex. 41 at 19–20.)  For example, on June 5, 2021, Rivera invited her to his baby shower, to which she responded, "I'll be there."[8]  (Day 2 at 227; Ex. 41 at 29.)  Then, on June 15, 2021, Rivera texted Plaintiff, "Yo yo yo," to which Plaintiff responded, "Yes!! What happened? You suck."  (Day 2 at 230–31; Ex. 41 at 32.)  After Rivera didn't respond to her text, Plaintiff texted him again, saying "I need to talk to you."  (Day 2 at 231; Ex. 41 at 33.)  And perhaps most egregiously, on July 30, 2021 Rivera texted Plaintiff, "How did I do," apparently in connection to him standing

---

[8]  Plaintiff ultimately did not attend because she was out of town.  (Day 2 at 227; Ex. 41 at 30.)

in for the Mayor at a City Council meeting.  (Day 2 at 236–38; Ex. 41 at 48.)  Plaintiff responded

"Wonderful! You like the town's Mayor."  (Day 2 at 237; Ex. 41 at 48.)  When Rivera asked

Plaintiff to be honest because he respected her opinion, Plaintiff responded, "Papi, you did really

good.  You looked like the Mayor, a Mayor."[9] (Day 2 at 237; Ex. 41 at 48.)

Additionally, notwithstanding Rivera's sexual misconduct, Plaintiff and Rivera continued

to exchange messages about issues and events occurring around City Hall.  (Ex. 41 at 35–44.)

This included gossiping about other employees, Plaintiff venting to Rivera about an internal

investigation she was being subjected to, and Plaintiff confiding in Rivera that she was planning

on resigning from her position as human resources director.  (*Id.*; Day 2 at 231–37.)

### 3.    The August 2021 Incidents and Photo

The next instance of Rivera's inappropriate conduct occurred on the morning of Monday,

August 2, 2021.  At 11:07 a.m., Rivera texted Plaintiff, "Hey," which Plaintiff responded to a

few hours later, saying "Que paso??", meaning "what happened??"  (Day 2 at 81; Ex. 41 at 49.)

Rivera then texted her in Spanish, saying "ti lo quiero meter," meaning, again, that he wanted to

stick it in her.  (Day 2 at 81; Ex. 41 at 49; Day 1 at 92 (Rivera).)  He also asked Plaintiff to call

him.  (Day 2 at 81–82; Ex. 41 at 49.)  Plaintiff did not respond to either of these texts and

testified that upon receiving them, she felt "[d]isgusted, disrespected, [and] humiliated."  (Day 2

at 82.)  A few hours later, at 3:19 p.m., Rivera sent Plaintiff a photograph of ejaculate in the palm

of his hand and a text message, saying "15 minutes ago.  What a waste."  (*Id.* at 83; Day 1 at 92–

94, 96; Ex. 41 at 49.)  Plaintiff responded shortly thereafter, writing "You are nasty!!!!!!!!"  (Day

2 at 84; Ex. 41 at 50.)  Rivera then replied, "That's not nasty.  Those are vitamins."  (Day 2 at

---

[9] Plaintiff testified that "Papi" is a term of endearment.  (Day 2 at 237–38.)  Rivera testified that Plaintiff would occasionally come into his office and say, "what's up [Papi]?"  (Day 1 at 86; *cf. id.* at 102 (Rivera testifying that Plaintiff would make comments such as "oh, daddy, you look good today").)

84; Ex. 41 at 50.)  Plaintiff responded by saying "Crazy," to which Rivera replied, "Yo estoy

para ti.  Between us 2."[10]  (Day 2 at 84; Ex. 41 at 50.)

Soon after this text exchange with Rivera, Plaintiff disclosed the incident to Denbowski

during one of their weekly meetings.  (Day 2 at 86.)  During this meeting, Plaintiff showed

Denbowski the photograph of the ejaculate in the palm of Rivera's hand.  (*Id.*)  But, out of fear

of retaliation and a desire to handle it herself, Plaintiff asked Denbowski not to do anything

about the incident.  (*Id.* at 101.)  Denbowski reiterated that Rivera was out of control.  (*Id.* at 86.)

In addition to sharing this photo with Denbowski, Plaintiff testified that a few hours after

receiving the photo, she showed it to Helen Ramos, her assistant.  (*Id.* at 85.)  Plaintiff also later

showed the photo to her friend, and former City employee, Dana Rodriguez, but she was unable

to recall when this occurred.  (*Id.* at 86 ("The Court: Is this all the same day? Is it all August

2nd? [Acevedo]: I don't recall if I showed Donna [sic] Rodriguez on the same day, Your

Honor.").)  Later, Plaintiff also showed the photo to the Berks County District Attorney's Office,

a City councilwoman, the deputy police chief, and her brother.  (*Id.* at 95, 97.)  But Plaintiff did

not report the incident to Amoros at that time.  (*Id.* at 238.)

Plaintiff testified that after receiving this photo, she felt "disgusted, degraded,

disrespected, [and] humiliated."  (*Id.* at 84.)  She explained that Rivera's photo threw her into a

state of shock and brought her back to a memory of when she was 7 years old and had semen

placed on her right thigh.  (*Id.* at 83–84, 88–89, 248; *see also id.* at 121 (Plaintiff testifying that

---

[10] Rivera testified that he and Plaintiff had a flirtatious relationship and would make jokes of a sexual nature to each other.  (Day 1 at 85–86, 90.)  He testified that this photo was an extension of that relationship: "She was in my office that day for about an hour and a half and we were talking and she was joking around and she asked me why was I still single and if I had girlfriends, and we were back and forth joking around and she said what a waste, young, good looking, and that's when the exchange happened."  (*Id.* at 93–95.)  Plaintiff claimed this conversation never occurred.  (Day 2 at 83.)

her "shield for sexual harassment is not strong," because of her past trauma).)  Plaintiff testified

that as a result of this trauma, she withdrew from her family and friends, and no longer had the

strength to "hold the fort" for her children.  (*Id.* at 125.)  She also testified that she is "afraid to

smile to men and be [herself] because [she] feel[s] like they are going to misinterpret" her

intentions.  (*Id.* at 124.)

Despite this testimony, Plaintiff texted Rivera the very next day after he sent this photo,

saying "what kind of bull shit is Tornielli saying about me now?  I hope he has proof and they

don't take his word for it," apparently in reference to allegations made by the then-chief of

police.  (*Id.* at 247–48; Ex. 41 at 52.)  Rivera and Plaintiff proceeded to sporadically text each

other over the course of the next few months, including an instance where Rivera texted Plaintiff

saying that he hopes she is okay, to which Plaintiff responded in part, "Thank you for your

contact, I really appreciate it."  (Day 2 at 250; Ex. 41 at 55–57.)  And according to Rivera,

Plaintiff would still constantly visit his office after he sent this photo.  (Day 1 at 106.)

When faced with the reality of these text messages and her subsequent interactions with

Rivera, Plaintiff testified that her experience in the military allowed her to put aside her personal

feelings, and that she tried to limit her interactions with Rivera.  (Day 2 at 89, 248–49.)

### 4.     The September 2021 Incident at the Latino Convention

The final instance of harassment occurred in late September of 2021.  (*Id.* at 90–94.)

Mayor Moran and his staff were invited to a Latino Convention hosted at a local Reading hotel.

(*Id.* at 90.)  This was a multi-day event, but Plaintiff only had time to attend the evening dinner

portion.  (*Id.*)  On September 29, 2021, Plaintiff sent a text message to Rivera asking for two

tickets for the formal gala.  (*Id.* at 90–91; Day 1 at 110–11 (Rivera); Ex. 41 at 59.)  Rivera

10

informed her that she did not need a ticket and she could just show up with her friend (former co-worker Dana Rodriguez).  (Day 2 at 91.)

At the dinner, Plaintiff sat at a table with Rodriguez and Rivera, among others.  (*Id.* at 92; Day 1 at 111–12 (Rivera).)  Rivera sat directly next to Plaintiff.  (Day 2 at 92.)  Throughout most of the night, the table was engaged in friendly banter.  (*Id.* at 253–54.)  But later in the evening, while Plaintiff, Rodriguez, and Rivera were still sitting at the table, Rivera said "te lo meter," meaning "he wanted to fuck" Plaintiff.  (*Id.* at 93; Day 1 at 84, 117 (Rivera acknowledging that he might have said that in a joking and flirtatious manner).)  Rivera also told Plaintiff that Mayor Moran wanted to "fuck" her, said that the Mayor was going to be "upstairs waiting" for her, and gave her his hotel room number.  (Day 2 at 93–94; Day 3 at 20–21 (Rodriguez testifying that she heard Rivera make this comment).  *But see* Day 1 at 113, 118 (Rivera denying that he made this statement).)  Plaintiff did not believe that Rivera was serious about the Mayor's invitation.  (Day 2 at 254.)  Plaintiff and Rodriguez then got up and began to leave the event.  (*Id.* at 94.)  Plaintiff again reported Rivera's conduct to Denbowski (*id.* at 96) but did not discuss the incident with Amoros at the time (Day 3 at 94–95).[11]

While Plaintiff again testified that these comments had a detrimental effect on her mental wellbeing, (Day 2 at 94–95), she continued to exchange text messages with Rivera, including the day after the gala (*id.* at 255; Day 1 at 113; Ex. 41 at 59).  For example, on October 4, 2021 Plaintiff, after attempting to call Rivera, texted him saying "[y]ou only answer when you need something."  (Day 2 at 255–56; Ex. 41 at 58.)

---

[11] Rivera and Mayor Moran's assistant, Maria Delgado, had a different recollection of the Latino Convention than Plaintiff.  Both individuals testified that Rivera and Plaintiff participated in flirtatious and light-hearted conversation throughout the night.  (Day 1 at 117; Day 3 at 77–78.)  This culminated when Plaintiff asked Rivera to give her phone number to one of the band members that was playing that night, a request that Rivera fulfilled.  (Day 1 at 118–19; Day 3 at 78–79.)

### C.       Rivera's Termination

In the fall of 2021, the dynamics at City Hall began to shift.  According to City Solicitor Fred Lachat, the Mayor and his staff began to have some concerns with Plaintiff's work performance, namely her refusal to pass information to the law department.  (Day 1 at 43–44.) Lachat had a sit-down meeting with Plaintiff to discuss this issue in September of 2021.  (*Id.*) Around this time, Plaintiff was also beginning to show discontent with her treatment at City Hall. Her notes from October of 2021 indicate that she believed she was not being paid commensurate with her position, that she was being unfairly treated, including being muted while on a Zoom call, and that members of City Hall continued to view her authority as that of a human resources *manager*, as opposed to a human resources *director*.  (Day 2 at 266–67.)

Then, on October 12, 2021, Rivera accidentally sent a text message to Plaintiff that was intended for Mayor Moran.  (Day 1 at 114–15.)  In short, Rivera believed that Plaintiff was improperly circulating confidential information to the City Council.  (*Id.*)  He sent a photo of a document apparently issued from Plaintiff titled "Performance Appraisals Evaluations," and included a text message saying, "Aida can't be sharing this with anyone once Department Directors."  (*Id.*; Ex. 41 at 64.)  Realizing his error, Rivera sent a follow up message, which read, "I haven't told the mayor about this or anyone.  Let's meet soon."  (Ex. 41 at 64.)  According to Rivera, Plaintiff began to "switch[] up" on him after this text message was sent.  (Day 1 at 113.)

Against this backdrop, on or around October 19, 2021, Denbowski came to Plaintiff, as human resources director, to inform her of an incident involving Rivera and another employee. (Day 2 at 97–98.)  That same day, Plaintiff met with Amoros in person to report Rivera's inappropriate behavior.  (*Id.*)  During this conversation, Plaintiff added that she believed Rivera was out of control, showed Amoros the picture of ejaculate that Rivera had sent her in August,

and detailed Rivera's behavior over the previous ten months.  (*Id.* at 98–100.)  Plaintiff told Amoros that she didn't want him to do anything about Rivera's harassment of herself because she was afraid of retaliation.  (*Id.* at 100.)  Nevertheless, Amoros reported the photo to Mayor Moran, who shortly thereafter suspended Rivera pending an investigation by an outside law firm, McKnees Wallace.[12]  (Day 1 at 50–52; Day 3 at 97.)

Following Rivera's removal from City Hall, Plaintiff testified that she continued to have feelings of anxiety, stress, and pressure.  (Day 2 at 105–06.)  This feeling was exacerbated by Rivera spreading rumors to City personnel that the two of them were having a sexual relationship and that he had receipts to prove that they had been sharing hotel rooms.  (*Id.* at 104–05; Day 1 at 52–54 (Lachat testifying that Plaintiff reached out to him right before Thanksgiving about Rivera spreading false rumors).)  Plaintiff began feeling chest pains and was brought to the hospital by one of her employees.  (Day 2 at 106–07.)  Believing that her job was not worth the strain on her health, on November 26, 2021, from the emergency room, Plaintiff submitted her resignation (effective December 15, 2021), to Mayor Moran and Amoros.  (*Id.* at 107, 112.)

On December 6, 2021, the outside investigation into Rivera's conduct was completed and a report was submitted to City Solicitor Lachat.  (Day 1 at 28, 31.)  The report concluded that Rivera's conduct violated multiple City policies, including the workplace violence prevention policy, the employee conduct and work rules policy, and the sexual and other unlawful

---

[12] There were slightly different stories presented on when and how Moran came to learn of this photograph.  City Solicitor Lachat testified that he received a call from Amoros the evening that he was shown that photo, and that the next day, Lachat met with Rivera to inform him that he was being placed on administrative leave pending an outside investigation.  (Day 1 at 50–52; *see also* Day 2 at 101–02 (Plaintiff testifying the Amoros spoke with her the day after she showed him the photo and informed her that after speaking with counsel, he had to do something and then reported it to Mayor Moran).)  Amoros, on the other hand, testified that he spoke with Lachat and then showed Moran the photo of the ejaculate.  (Day 3 at 96.)  He testified that Moran left his office and returned 30 minutes later telling Amoros that Rivera was no longer in the building.  (*Id.* at 96, 107–08.)  Which recollection is correct is immaterial for purposes of the instant motion.

harassment policy.[13]  (*Id.* at 28–29.)  Lachat shared the report and its recommendation with

Mayor Moran.  (*Id.* at 53–54.)  In light of these findings, Moran terminated Rivera's

employment.  (*Id.*; Day 3 at 61.)

On December 8, 2021, Moran summoned Plaintiff to his office, where he handed her two

letters and asked her to read them.  (Day 2 at 112–14.)  The first letter informed Plaintiff that the

investigation of Rivera was complete and that corrective action would be taken.  (*Id.* at 114–16.)

Moran informed Plaintiff that Rivera had been terminated.[14]  (*Id.* at 116.)  The second letter

asked Plaintiff to rescind her resignation.  (*Id.* at 115.)  Plaintiff ultimately decided to remain on

the job.  (Day 2 at 116–17.)

## II.    Procedural History

Plaintiff filed this lawsuit on March 29, 2023.  (Doc. No. 1.)  In her initial complaint, she

asserted claims against the City under Title VII for retaliation in connection with her eventual

termination and for sex discrimination in the form of a hostile work environment.[15]  (*Id.*)  She

also asserted a claim under 42 U.S.C. § 1983 against Rivera for unlawful sex discrimination in

violation of the Equal Protection Clause of the Fourteenth Amendment and against Mayor Moran

for unlawful retaliation, also in violation of the Equal Protection Clause.  (*Id.*)

---

[13] The report also criticized Denbowski for not acting quickly enough to stop the harassment.  (*Id.* at 30.)
After the investigation, City Solicitor Lachat reprimanded Denbowski regarding his obligations to report
sexual harassment.  (*Id.* at 41, 56.)

[14] According to Plaintiff, Mayor Moran was "cold" and "curt" during this meeting and explained that the
decision to fire Rivera was "really hard" because Rivera was "like his son."  (Day 2 at 114, 116.)  Moran
testified that he never made such a statement.  (Day 3 at 65–66.)

[15] Before trial, Plaintiff submitted an Amended Complaint to add identical claims under the Pennsylvania
Human Relations Act because the claims under that statute had just been exhausted at the time.  (Doc. No.
59.)

## A.      Summary Judgment and Pretrial

Following the close of fact discovery, all Defendants moved for summary judgment. (Doc. Nos. 23, 25.)  After oral argument on the motions, the Court granted Nate Rivera's motion, finding that Plaintiff had not presented a triable issue as to whether Rivera was acting under the color of state law when he harassed her.  (Doc. No. 48 at 48–52.)  The Court also granted summary judgment to the City and Mayor Moran as to Plaintiff's claims for retaliation, finding that an outside investigation that the City later conducted into Plaintiff's conduct, which sustained numerous findings of rule violations by Plaintiff, was a legitimate, non-retaliatory business justification for her termination and that Plaintiff had failed to carry her burden of showing this justification was pretext.  (*Id.* at 34–46.)  The Court, however, denied Defendants' motion as to Plaintiff's claim against the City for hostile work environment.  (*Id.* at 22–34.)

The case proceeded as to this claim.  Following receipt of the parties' pretrial filings, including their pretrial memorandum which set forth the parties' anticipated witnesses, the Court held a final pretrial conference on April 30, 2024.  Just a few hours before this final pretrial conference, Plaintiff's counsel submitted a revised pretrial memorandum, which added an additional witness:  Plaintiff's assistant Helen Ramos.  (Doc. No. 70.)  At the final pretrial conference, defense counsel raised some concerns regarding Ms. Ramos's testimony, given that she was recently terminated from her position with the City.[16]  The Court determined that this issue was best resolved by conducting a *voir dire* of Ramos before she took the stand.  (*See* Day 1 at 123 (the Court reminding the parties that it was necessary for the Court to *voir dire* Helen

---

[16] Plaintiff's counsel asserted at the final pretrial conference that Ramos was terminated from her position with the City due to her name being raised during Plaintiff's deposition in this matter.  Defense counsel objected to this allegation.

Ramos before she took the stand); Day 2 at 128 (Plaintiff's counsel acknowledging that the Court planned to *voir dire* Helen Ramos).)

**B.   Trial**

On May 7, 2024, the case proceeded to trial.  Following jury selection, Plaintiff began her case-in-chief by calling City Solicitor Lachat and Rivera as witnesses.  (*See generally* Day 1.) The second day of trial consisted entirely of testimony from Plaintiff herself.  (*See generally* Day 2.)  Defense counsel extensively cross-examined Plaintiff, placing particular emphasis on the text messages that she sent Rivera after each purported instance of sexual harassment.  (Day 2 at 197–260.)  On the third and final day of trial, Plaintiff continued her case-in-chief by first calling Dana Rodriguez to the stand.  (Day 3 at 3.)  Rodriguez worked as the finance manager for the City of Reading from August 2020 to August 2021, at which point she voluntarily left.  (*Id.* at 4, 7.)  Rodriguez befriended Plaintiff during her tenure at City Hall and remains her friend to this day.  (*Id.* at 8, 23.)  Rodriguez testified regarding her observations of Rivera and Plaintiff during the September 2021 Latino Convention, stating that she heard Rivera tell Plaintiff that the Mayor was upstairs waiting for her.  (*Id.* at 19–21.)  Rodriguez further testified that upon hearing Rivera make this comment, Plaintiff looked forward silently in disbelief and that when she asked Plaintiff if she was doing okay, Plaintiff responded "[t]his fucker.  Who does he think he is?" and "why he will continue to do this to me."  (*Id.* at 21–22.)

Plaintiff's counsel then transitioned from discussing the gala in September to the August 2021 photo that Rivera sent Plaintiff. (*Id.* at 23.)  Plaintiff's counsel first asked how it came about that Plaintiff showed Rodriguez the photo, to which Rodriguez testified, "Ms. Acevedo, while I was employed and after, she was always very frustrated because she was always trying to get a meeting with Amoros and the Mayor and they would always cancel on her."  (*Id.*)  The City

objected on hearsay grounds and the Court sustained the objection saying: "Well, if you're going to the then existing mental condition, it has to be right at the same time. This sounds like it's the happening after, so I will sustain the objection. She can lay the foundation." (*Id.* at 24.) Plaintiff counsel then asked Rodriguez: "[W]hen she showed it to you, the picture, if you would be so kind as the best you can recall it just describe Aida's physical or emotional condition as you could see it?" (*Id.*) Rodriguez began to respond that "[s]he was like, do you believe something like this? No. Do you believe he does something like this to the HR manager." (*Id.*) This response led to a hearsay objection from defense counsel. (*Id.*) The Court called the parties to sidebar and thereafter took a morning break so the parties could present additional argument. (*Id.* at 25.) During this sidebar and break, defense counsel continued to argue that this testimony was hearsay in that it was being offered for the truth of how Plaintiff reacted to the photograph. (*Id.* at 25–26.) Plaintiff's counsel, in turn, argued that this was not hearsay because it was being offered to show her state of mind and "her reaction to seeing this picture." (*Id.*) Additionally, he argued that this statement fell within the excited utterance exception under Federal Rule of Evidence 803(2) and the then-existing mental state exception under Federal Rule of Evidence 803(3). (*Id.* at 27.) The Court sustained the City's objection. (*Id.* at 29.) Specifically, the Court stated:

> I don't believe this is an excited utterance because it is not at the time that she received the text message, and I don't believe that it fits under the then existing mental, emotional or physical condition under 803(3). Plaintiff made statements about how she was feeling, discussing the issue after the fact with Mrs. Rodriguez. That is not sufficiently contemporaneous. And the statement that she made needs to be very close in time to when she was actually viewing the photograph on her phone as it was sent to her. . . . [T]his is a very limited exception under 803(3). Otherwise it would subsume the entire hearsay rule. So for those reasons I am sustaining the objection.

17

(*Id.* at 29–30.)  Plaintiff's counsel then put on the record that if permitted he would have asked two additional questions: 1) "Did Ms. Acevedo tell you how she was feeling at that moment?" 2) "Did she tell you why she was upset?"  (*Id.* at 30.)

Once the jury returned, Plaintiff's counsel asked Rodriguez the following question: "Ms. Rodriguez, if you'd be so kind and without telling us anything Ms. Acevedo may have said, if you would simply describe what you observed on her face or her body or her condition when she was showing you the picture."  (*Id.* at 31.)  The City objected on hearsay grounds and the Court sustained the objection for the same reasons as the previous ruling.  (*Id.*)  Rodriguez proceeded to testify that following this incident, Plaintiff has been "[d]epressed," "[a]gitated," "[c]rying easily" and not the "cheerleader that she always was."  (*Id.* at 32–33.)

Following the testimony of Rodriguez, Plaintiff called Mayor Moran to the stand.  (*Id.* at 34.)  After Moran's testimony, the Court, expecting Helen Ramos to be the next witness, had the jury leave for a morning break.  (*Id.* at 71; *see also* Day 2 at 128 (Plaintiff's counsel informing the Court that he intended to call Ramos, Rodriguez, and Moran after Plaintiff herself testified)).)  After asking the parties how they would like to proceed with the *voir dire* of Ramos, Plaintiff's counsel stated: "We have something exciting to share, we don't have any further witness [sic] to present.  We are going to rest our case."  (Day 3 at 71.)  In other words, without explanation, Plaintiff decided not to call Ramos as a witness.  (*Id.*)  The Court thus proceeded to the City's case-in-chief, in which the City called Mayor Moran's assistant, Maria Delgado, and former City Manager Abe Amoros as witnesses.  (*Id.* at 73–112.)  Following these witnesses, the parties presented their closing arguments, and the Court charged the jury.  (*Id.* at 120–183.)  The jury then left for deliberations.

A few hours into their deliberations, the jury submitted a question to the Court, reading: "Question 1 mentions Aida specifically, but your instructions say to consider a reasonable woman.  Do we answer based on Aida specifically?"  (May 9, 2024 Trial Tr., Jury Notes at 3.) After consulting with counsel, the Court simply reread the jury instructions regarding the elements of a hostile work environment claim without any additional commentary.  (*Id.* at 5, 7–11.)  The jury returned to their deliberations.

Shortly thereafter the jury returned a verdict for defense.  (May 9, 2024 Trial Tr., Verdict at 3.)  In particular, the jury answered "No" to the following question on the verdict form: "Do you find, by a preponderance of the evidence, that Aida Acevedo was subjected to a hostile work environment on the basis of her sex during her employment with the City of Reading?"  (Doc. No. 83.)  Because they answered no to this question, the jury did not reach the second question, asking: "Do you find that management level employee(s) of the City of Reading knew, or should have known, of the sexually hostile work environment?"  (*Id.*)  The Court polled the jury, who confirmed this verdict.  (May 9, 2024 Trial Tr., Verdict at 3–6.)  The following day, May 10, 2024, judgment was entered in favor of the City.  (Doc. No. 82.)

### C.   The Instant Motion for New Trial

On June 7, 2024, Plaintiff filed a motion for new trial.  (Doc. No. 85.)  This motion, however, was completely devoid of record citations and indicated an intent to supplement the motion when the trial transcripts were received.[17]  (*Id.* at 3, 13.)  The Court permitted Plaintiff leave to file a supplemental brief once the trial transcripts were received to add citations and correct any misstatements of fact.  (Doc. No. 89.)  However, due to the firm 28-day deadline for

---

[17] The records attached to the motion indicated that despite having the opportunity to order the transcripts on a more expedited basis, albeit at an increased cost, Plaintiff ordered the transcripts 13 days after the entry of judgment, requesting a 30-day turnaround. (Doc. No. 86.)  In other words, it was Plaintiff's attempts to expend less money on the transcripts that drew out this briefing process.

motions for new trial under Federal Rule of Civil Procedure 59(b), which the Court cannot extend regardless of whether there is good cause, *see* Fed. R. Civ. P. 6(b)(2), Plaintiff was not permitted to include new arguments in her supplemental brief. (*Id.*) On June 26, 2024, this supplemental brief was filed as an amended motion (Doc. No. 90), and on July 2, 2024, the City filed its opposition (Doc. No. 97).

## III.   Legal Standard

Plaintiff moves pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), which provides that the Court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court." Although not explicit in the Rule, the Court may grant a new trial where there was "substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict [is] inadequate or excessive; or where the verdict [is] against the weight of the evidence." *Giedgowd v. Cafaro Grp., LLC*, No. CV 20-6184, 2021 WL 4963533, at *13 (E.D. Pa. Oct. 26, 2021). Where the motion for new trial is premised on the Court's evidentiary ruling, a two-step process is employed. *Pierce v. City of Philadelphia*, 391 F. Supp. 3d 419, 432 (E.D. Pa. 2019). First, the Court must determine whether an error was in fact made. *Id.* Second, the Court must determine whether "that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Id.*; *see also* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); Fed. R. Evid 103(a) (providing that "[a] party may claim error in a ruling to admit or exclude

evidence only if the error affects a substantial right of the party"). As to this second step, the Third Circuit has provided that "a non-constitutional legal error [is] harmless if it is highly probable that the error did not affect the judgment." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 329 (3d Cir. 2001). "This standard has been described as moderately stringent, though not unreasonably high, and we need only be well-satisfied that the error did not prejudice a party, but we need not disprove every reasonable possibility of prejudice." *Pociute v. W. Chester Univ.*, 117 F. App'x 832, 835 (3d Cir. 2004) (citations and quotation marks omitted). "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992).

## IV.    Discussion

Plaintiff argues that by sustaining the hearsay objection as to Rodriguez's testimony the Court committed substantial error. (Doc. No. 90.) Plaintiff argues that this error was not limited Rodriguez's testimony, but also prevented Plaintiff from presenting the testimony of Plaintiff's assistant, Helen Ramos. (*Id.* at 9.) Consistent with the two-step process discussed above, the Court first addresses whether the hearsay ruling was erroneous. We then turn to the scope of that purported error, and in particular Plaintiff's argument that the Court's ruling prevented her from presenting the testimony of Ramos. And finally, we turn to whether the Court's exclusion of Rodriguez's testimony was harmless.

### A.    Whether the Court's Hearsay Ruling Was Erroneous

The Court turns first to determining whether an error was in fact made when the Court sustained the City's hearsay objection. As noted above, in response to Plaintiff's counsel's question about Plaintiff's "physical or emotional condition" when showing Rodriguez the August 2021 photo, Rodriguez began testifying: "[s]he was like, do you believe something like

this?  No.  Do you believe he does something like this to the HR manager."  (Day 3 at 24.)  This response drew a hearsay objection from the City.  (*Id.*)  After the Court sustained the objection, Plaintiff put on the record that if permitted he would have asked two additional questions: 1) "Did Ms. Acevedo tell you how she was feeling at that moment?"  2) "Did she tell you why she was upset?"  (*Id.* at 30.)  Plaintiff argues that the Court preventing Rodriguez from answering these three questions was erroneous.  (Doc. No. 90 at 8–9.)  Although not entirely clear from the motion, it appears that Plaintiff is reasserting the arguments she presented at trial when this issue arose,[18] namely that this testimony was not hearsay in the first place and that even if it was, it would fall within the excited utterance exception under Rule 803(2) or the then-existing mental, emotional, or physical condition exception under Rule 803(3).  (*Id.*)  The Court addresses each argument in turn.

### 1.  The Definition of Hearsay

Plaintiff first argues that the testimony offered by Rodriguez was not hearsay.  (Doc. No. 90 at 9.)  The Federal Rules of Evidence define hearsay as a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c); *see also Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4963528, at *1 (E.D. Pa. Oct. 26, 2021) (explaining that hearsay is an "out-of-court statement that a party offers into evidence to prove the truth of the matter asserted").  Here Plaintiff does not appear to contest that the first portion of this test is satisfied, and for good reason:  Rodriguez testified as to Plaintiff's out-of-court reaction to Rivera's photo and Plaintiff's counsel's proposed follow up questions called for the

---

[18] Plaintiff's motion for new trial merely summarizes the argument made at trial as to why this testimony should not have been excluded.  (Doc. No. 90 at 9.)  The motion does not set forth any additional legal argument or provide any case citations as why the Court's ruling was made in error.  (*Id.*)  The Court therefore assumes that Plaintiff is raising the same three bases argued at trial.

same.  (*Id.* at 24, 30.)  Plaintiff instead contends that this testimony was not offered for the truth, because "it wasn't tendered to prove the harassment took place but was offered to show Acevedo's state of mind at the recounting of what she had experienced." (Doc. No. 90 at 9.) The Court finds Plaintiff's reasoning confused.  Counsel's questions called for Rodriguez to recount Plaintiff's reaction to receiving the photo from Rivera.  (Day 3 at 24, 30.)  In other words, the truth intended to be asserted by this testimony was that Plaintiff had a negative reaction to Rivera's photo.  And as Plaintiff appears to acknowledge, this testimony was offered for exactly that purpose:  to show that Plaintiff was offended by Rivera's conduct such that she could satisfy the subjective component of her prima facie case of hostile work environment. (Doc. No. 90 at 9.)  Because Rodriguez's testimony and counsel's follow up questions consisted of, or called for, out-of-court statements that were offered for their truth, the Court did not err in finding them to be hearsay.

### 2.    The Excited Utterance Exception

Plaintiff argues in the alternative that even if this testimony was deemed hearsay, it falls within the excited utterance exception set forth in Rule 803(2).  This Rule provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" should not be excluded as hearsay.  Fed. R. Evid. 803(2).  "The rationale for the excited utterance exception lies in the notion that excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable." *United States v. Brown*, 254 F.3d 454, 460–61 (3d Cir. 2001).  To qualify as an excited utterance, "the party seeking to introduce the statement must show each of the following: (1) a startling event occurred, (2) a statement relating to the circumstances of the startling event was made, (3) the

declarant making the statement must have had an opportunity to personally observe the events, and (4) the statement was made before the declarant had time to reflect and fabricate." *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998).  As to the fourth factor, Rule 803(2) "does not require that, in order to be admissible, the statement be contemporaneous with the startling event, but rather only with the excitement caused by the event." *Brown*, 254 F.3d at 460–61. Nevertheless, in determining whether the person is still startled, courts often look at how much time has elapsed between the event and the statement.  *See United States v. Lawrence*, 349 F.3d 109, 119 n.8 (3d Cir. 2003) ("[C]ommon sense suggests that the lapse of time, and change of scene is relevant to determining the extent to which a statement is spontaneous or the result of deliberation.").  "The party who seeks to admit the statement bears the burden of establishing that it qualifies as an excited utterance." *United States v. Berberena*, No. CR 21-42, 2022 WL 282913, at *2 (E.D. Pa. Jan. 31, 2022) (citing *David by Berkeley v. Pueblo Supermarket of St. Thomas*, 740 F.2d 230, 235 (3d Cir. 1984)).

Here, Plaintiff failed to meet her burden as to the fourth prong because she did not establish when Rodriguez was shown the photo relative to when Plaintiff received it. Rodriguez's testimony on this point is at best ambiguous, as she testified that she was shown the photo "at some point in time."  (Day 3 at 23.)  Previously, the Court asked Plaintiff herself if she showed Rodriguez the photo the same day she received it, and Plaintiff testified that she didn't recall when it was shown.  (Day 2 at 86 ("The Court: Is this all the same day?  Is it all August 2nd?  [Acevedo]: I don't recall if I showed Donna Rodriguez on the same day, Your Honor.").) Based on this record, the Court cannot determine whether Rodriguez was shown this photo the same day Plaintiff received it, or if Plaintiff waited days, weeks, or even months to show it to Rodriguez.

Without any record of how much time passed or any other evidence suggesting that Plaintiff was still in an excited state,[19] the Court cannot conclude that Plaintiff lacked the chance to reflect and fabricate her reaction.[20]  *Cf. Guest v. Oak Leaf Outdoors, Inc.*, No. CIV.A. 10-5288, 2012 WL 1521925, at *4 (E.D. Pa. Apr. 30, 2012) (finding the excited utterance exception did not apply because "the temporal gap of more than six minutes was sufficient to give the declarant time to reflect and possibly fabricate his statement to the Officer"); *McKinley v. Meier*, 456 F. Supp. 3d 673, 677 (E.D. Pa. 2020) ("Plaintiff cannot satisfy the fourth requirement, as multiple hours passed between the alleged dayroom incident and the conversation at dinner. Admittedly, the rule does not mandate that the statement be 'contemporaneous with the startling event,' but rather only that it be contemporaneous with 'the excitement caused by the event.' Here, too much time passed for one to be confident in presuming that any contemporaneous emotional reaction overwhelmed Mr. Tirado's capacity to reflect upon what he had heard." (citations omitted)).  Indeed, the Court has no way of determining whether this photo was shown to Rodriguez before or after Plaintiff retained an attorney or filed her charge with the EEOC related to Rivera's conduct.  In other words, depending on when this photo was shown, Plaintiff

---

[19] Plaintiff's counsel argued at trial that the timing of when Plaintiff received this photo is irrelevant because of "how the witness described the conditions of the declarant."  (Day 3 at 28.)  The Court disagrees.  Rodriguez testified only that in response to showing her the August 2021 photo, Plaintiff said, "do you believe something like this?" and "[d]o you believe he does something like this to the HR manager?"  (*Id.* at 24.)  This testimony is insufficient to support a conclusion that at some unidentified time, Plaintiff remained in such a startled state *from receiving the photo* that she could not reflect or deliberate.  *Cf. Brown*, 254 F.3d at 460 (holding that statements were excited utterances where "declarants were still visibly in an excited state" and appeared to be "very nervous" and "hopping around").

[20] The Court does not understand Plaintiff to be arguing that the startling event at issue was not Plaintiff's receipt of the photo from Rivera, but her showing the photo to Rodriguez.  (*See* Day 3 at 28 (Plaintiff's counsel arguing that Plaintiff was "under the excited . . . caused by getting this picture").)  But to the extent she intends to raise this argument, the Court finds that she has failed to carry her burden.  While Plaintiff's statements would be contemporaneous with this event, the Court fails to see how the presentation of the photo at some indeterminate time after it was received would be so startling that it would suspend Plaintiff's "powers of reflection and fabrication."  *Brown*, 254 F.3d at 460–61.

could have had both the time and the motivation to fabricate her reaction to the photograph she received by Rivera.  Because it was Plaintiff's burden to prove that Rodriguez's testimony fell within the excited utterance exception and she failed to satisfy the fourth element of that exception, the Court's refusal to overrule the City's objection on this ground was not error.

### 3.    The Then-Existing Mental Condition Exception

Finally, Plaintiff argues that Rodriguez's testimony falls within the then-existing mental, emotional, or physical condition exception under Rule 803(3).  Rule 803(3) excludes from the hearsay rule,

> [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

The advisory notes to Rule 803(3) provide that it is a "specialized application" of the present sense impression exception set forth in Federal Rule of Evidence 803(1).  Fed. R. Evid. 803 advisory committee's notes to proposed rules.  The present sense impression exception, in turn, excludes from the hearsay rule "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  As the advisory notes for Rule 803(1) make clear, to fall within the present sense impression exception, there must be "substantial contemporaneity of event and statement [to negate] the likelihood of deliberate or conscious misrepresentation."  *Id.*  Putting these pieces together, "Rule 803(3) permits admission of such statements where, among other things, the statements occurred contemporaneous with the event sought to be proved and the defendant did not have a chance to reflect."  *United States v. Reyes*, 239 F.3d 722, 743 (5th Cir. 2001); *see also Hussey v. Chase Manhattan Bank*, No. CIV.A. 02-7099, 2005 WL 1787571, at *7 (E.D. Pa. July 27, 2005) ("For a

hearsay statement to be admissible under Rule 803(3), the statement must occur contemporaneous with the state of mind sought to be proved, and the party must not have had time to reflect and possibly fabricate or misrepresent [her] thoughts."); *United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir. 1980) ("In making the foundational inquiry on admissibility under [Rule 803(3)], the court must evaluate three factors: contemporaneousness, chance for reflection, and relevance."); *United States v. Salas-Aguayo*, No. CR 12-3109 JB, 2024 WL 453642, at *7 (D.N.M. Feb. 6, 2024) (providing that to fall within the Rule 803(3) exception, the statement "must relate to the declarant's state of mind *during the incident in question*" (emphasis added)).  Again, "the proponent of this evidence bears the burden of proving that particular evidence falls within [this] hearsay exception."  *See Walker v. Studlack*, No. 1:17-CV-2371, 2022 WL 290697, at *3 (M.D. Pa. Jan. 31, 2022).

Here, the Court finds that Rodriguez's testimony does not fall within the then-existing mental state exception for much of the same reason that it does not fall within the excited utterance exception:  Plaintiff has failed to sufficiently establish when she showed Rodriguez the photo, and it is therefore impossible for the Court to determine whether Plaintiff had sufficient time and motivation to reflect and fabricate her feelings.[21]  *See Hussey*, 2005 WL 1787571, at *7 (finding statement did not fall within Rule 803(3) because "there is no evidence that Plaintiff made any statements to Mrs. Hussey regarding his beliefs about disability insurance contemporaneously with his opportunity to enroll in the LTD Excess plan" and the plaintiff had the opportunity to "reflect and possibly fabricate or misrepresent his thoughts" (quotation marks omitted)); *cf. United States v. Secor*, 73 F. App'x 554, 566 (4th Cir. 2003) ("Given the

---

[21] Significantly, as noted above, *see supra* at Section IV(A)(2), the Court has no way of determining whether this photo was shown to Rodriguez before or after Plaintiff retained counsel and or filed her charge with the EEOC related to Rivera's conduct.

circumstances under which Dougherty made these statements, therefore, the district court properly excluded this evidence because Dougherty had time to reflect and fabricate.").  Indeed, the Court explained to Plaintiff's counsel right before he asked the question at issue that he needed to "lay the foundation" for Rule 803(3) by showing contemporaneity before he could demonstrate that the then-existing mental state exception is met.  (Day 3 at 24.)  Counsel, however, failed to do so.  (*Id.*)

Plaintiff attempts to sidestep this contemporaneity requirement by arguing that this testimony was offered to show Plaintiff's state of mind "at the recounting of what she had experienced," rendering irrelevant the gap between when she received the message and when she showed it to Rodriguez.  (Doc. No. 90 at 9–10.)  But again, consistent with the requirement that the declarant not have time to reflect, to fall within the state of mind exception, the statement must be made contemporaneous *to the conduct to which it is related.  See Phillips v. Potter*, No. CIV.A. 7-815, 2009 WL 3271238, at *3 (W.D. Pa. Oct. 9, 2009) (noting that "a statement made four hours *after the event to which it related* has been held inadmissible as not sufficiently contemporaneous under Rule 803(3)" (emphasis added) (citing *United States v. Macey*, 8 F.3d 462, 467–68 (7th Cir. 1993)); *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) ("[T]o fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind during the various fraudulent transactions. But the excluded statements in this case concerned what Netschi said or did after the fraudulent transactions had taken place and as the scheme itself was being discovered.  Such statements do not fit within Rule 803(3)'s 'state of mind' exception.").  Here, the event Plaintiff was speaking to Rodriguez about was her receipt of Rivera's photo, and based on the record presented by Plaintiff, her receipt of this photo could have occurred days, weeks, or even months before the

photo was shown to Rodriguez.  Permitting Rodriguez to testify as to Plaintiff's statements under these circumstances simply because Plaintiff recounted this event at some later time would be turning a blind eye to the principles underlying this limited exception and would render the Federal Rule of Evidence's general ban on hearsay evidence toothless.  Thus, the Court's ruling that Rodriguez's testimony did not fall within the then-existing mental state exception was not made in error.

* * *

In sum, the Court finds that Rodriguez's testimony was hearsay that did not fall within either of the two proffered hearsay exceptions.  Thus, the Court did not err when it sustained the City's hearsay objection.

### B. Harmless Error

In the alternative, the Court finds that even if its hearsay ruling was erroneous, that error was harmless.  Before discussing Plaintiff's arguments on this issue, the Court must first define the scope of the purported error.

#### 1. Scope of the Purported Error

Plaintiff asserts that the Court's ruling not only prevented the jury from hearing Rodriguez's testimony as to the effect the August 2021 photo had on Plaintiff but also prevented Plaintiff from presenting the testimony of Helen Ramos on the same topic.  (Doc. No. 90 at 9.) Apparently, Plaintiff believes that had Ramos taken the stand, the Court would have applied the same rationale discussed above and sustained hearsay objections from the City.  (*Id.*)

The problem for Plaintiff, however, is that there is absolutely nothing in the record to support her assertion that the Court's ruling caused her not to call Helen Ramos.  Following the testimony of Mayor Moran, the Court had the jury leave for a break so that the Court could *voir*

*dire* Ramos.  At this point, Plaintiff, without explanation, stated: "We have something exciting to share, we don't have any further witness [sic] to present.  We are going to rest our case."  (Day 3 at 71.)  At no point did Plaintiff's counsel explain that his reason for not calling Ramos was that her testimony may constitute hearsay under the Court's ruling as to Rodriguez.  Thus, the Court cannot credit Plaintiff's after-the-fact attempt to bootstrap Ramos's testimony to Rodriguez's.

The Court also does not find this belated explanation credible.  Whether a statement falls within a hearsay exception is a necessarily context-specific inquiry.  *See United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009) (describing the "hearsay inquiry" as "fact-specific"); *Cal. Expanded Metal Prod. Co. v. Klein*, No. C18-0659JLR, 2019 WL 6330227, at *2 (W.D. Wash. Nov. 26, 2019) ("Hearsay admissibility determinations are highly fact- and context-specific.").  The Court's ruling that the question and answer presented during Rodriguez's testimony constituted inadmissible hearsay thus had little bearing on whether Ramos could testify as to Plaintiff's reaction to the photograph.  Indeed, in contrast to Rodriguez, the record suggested that Plaintiff showed Ramos the photograph just a few hours after she received it from Rivera.  (Day 2 at 85.)  Thus, contrary to Plaintiff's assertion that putting Ramos on the stand would have been a "waste of precious time" (Doc. No. 98 at 3 n.1), the reaction to which Ramos would have testified may have been sufficiently contemporaneous to Plaintiff receiving the photo from Rivera to fall within the excited utterance or current mental state exceptions.  *See supra* at Section IV(A)(2),(3).  And Plaintiff's counsel should have known that this was a possibility, given that the Court explained that the objection to Rodriguez's testimony was sustained due to a lack of evidence as to when Rodriguez was shown the photo (Day 3 at 30; *id.* at 28 ("THE COURT: We don't even know the timeframe of when she showed the picture")), and Plaintiff testified the day prior that she showed the photo to Ramos hours after receiving it

(Day 2 at 85).  Making matters worse, the Court already stated its intention to *voir dire* Ramos before she took the stand given concerns the City raised during the final pretrial conference about her testimony veering into irrelevant matters.  (Day 1 at 123; Day 2 at 128.)  Plaintiff thus had the opportunity to question Ramos before the Court and see the extent to which the Court would find her testimony admissible.  Plaintiff did not utilize this opportunity and cannot now use this motion to blame the Court for Plaintiff's own decision not to call Ramos.

Since Plaintiff did not create any record suggesting that she did not call Ramos due to the Court's hearsay ruling, the Court will not consider this to be within the scope of any purported error committed in sustaining the City's hearsay objection as to Rodriguez's testimony.  *Cf. Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[A] party who fails to object to errors at trial waives the right to complain about them following trial."); *Stich v. United States*, 730 F.2d 115, 119 (3d Cir. 1984) (finding that "[i]n the absence of any timely, specific objection, we cannot predicate any error on the admission" of certain evidence).

## 2.    Harmlessness

With the scope of the purported error clarified, we now turn to whether the Court's purportedly erroneous hearsay ruling was harmless.  As previously noted, the Court may grant a new trial only where it made an error that was "so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice."  *Washington v. Gilmore*, No. CV 18-340, 2022 WL 4279858, at *2 (W.D. Pa. Sept. 15, 2022), *aff'd*, No. 22-2309, 2023 WL 4363113 (3d Cir. July 6, 2023) (quotation marks omitted).

Here, Plaintiff claims that by preventing Rodriguez from corroborating her testimony as to the effect of Rivera's photo, the Court short circuited her claim at the third component of hostile work environment, which requires a plaintiff to demonstrate that they were detrimentally

affected by the conduct at issue.  (Doc. No. 90 at 9–12); *Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021) (citing *Minarsky v. Susquehanna County*, 895 F.3d 303, 310 (3d Cir. 2018)).  But the evidence presented by the City as to this component of a hostile work environment claim was so strong and the scope of the excluded testimony was so limited that even if Rodriguez answered the excluded questions, it is "highly probable" that the jury would have returned a verdict for the City.  *Gen. Motors Corp.*, 263 F.3d at 329; *see also Ahsaki Gordon v. Allstate Prop. & Cas. Ins. Co.*, 704 F. App'x 149, 152 (3d Cir. 2017) ("Because Gordon presented ample evidence to support the determination that the loss was caused by a windstorm—and therefore was covered by the express terms of the contract—it is highly probable that the jury would have reached that same result even without Gordon's reasonable expectations testimony.").

Plaintiff testified that after each of Rivera's inappropriate acts, she felt "degraded" and "disgusted."  (Day 2 at 77, 83–84, 225.)  And specifically as to the August 2021 photograph, she testified that it retriggered trauma that she had suppressed from her childhood, thus causing her to lose control of her emotional state.  (*Id.* at 83–84, 88–89.)  But as the City presented to the jury and as is detailed earlier in this Memorandum, *see supra* at Section I(B), after every instance of Rivera harassing her, Plaintiff continued to text Rivera casually and sometimes flirtatiously. For example, after the January 2021 incident in which Rivera told Plaintiff that he was there to satisfy her sexual needs and that she gave the Mayor an erection (Day 2 at 42–43, 76–77), Plaintiff sent Rivera a string of flirtatious texts while she was out with her friends, including a message where she told him to "stop flirting with other girls" (*id.* at 212; Ex. 41 at 10).  Then, after the March incident in which Rivera purportedly told Plaintiff that he wanted to "stick it in" her and solicited her for sex with the Mayor (Day 2 at 45–47), Plaintiff sent him a text the very

next day, and just a short while later, she sent him another text saying "Papi, you did really good. You looked like the Mayor, a Mayor" (*id.* at 237; Ex. 41 at 47).  And most relevant to the testimony at issue here, the morning after the incident in which Rivera sent Plaintiff a photo of his ejaculate, an incident that Plaintiff claims put her in a box and has prevented her from even smiling at men to this day (Day 2 at 88–89, 124), Plaintiff texted Rivera, saying "what kind of bull shit is Tornielli saying about me now?  I hope he has proof and they don't take his word for it," apparently in reference to allegations about Plaintiff made by the then-chief of police (*id.* at 247–48; Ex. 41 at 52).  And just a few weeks later, Plaintiff texted Rivera asking him for tickets to the September 2021 Latino Convention, an event in which Plaintiff would sit with Rivera and purportedly engage in friendly conversation.  (Day 2 at 90–92, 253–54.)

On top of these text messages, the record suggests that even after his inappropriate conduct, Plaintiff continued to visit Rivera while she waited for Denbowski to return for their regular meetings.  (Day 1 at 106 (Rivera).)  Importantly, there was a back door to Denbowski's office, allowing Plaintiff to avoid Rivera entirely if she wished.  (Day 2 at 162; Day 3 at 76.) And while Plaintiff testified that she continued to communicate with Rivera because in the military she learned to set aside her personal feelings (Day 2 at 89, 248–49), significantly, the record presented at trial revealed that Plaintiff and Rivera's responsibilities did not overlap at the City (*id.* at 224; Day 1 at 88).  In other words, the jury heard that Plaintiff was not obligated to speak with Rivera at all to carry out her tasks as human resources director, and instead her texts, visits, and calls were voluntary.[22]

---

[22] The City also provided the jury with a reasonable explanation for why Plaintiff waited until October 2021 to report Rivera's conduct the Amoros.  In particular, the City presented testimony suggesting that members of the City were concerned about Plaintiff's work performance and had a sit down meeting with her in September 2021 to address some of those concerns.  (Day 1 at 43–44; Day 3 at 54.)  Additionally, Plaintiff's contemporaneous notes introduced at trial reflect that she was unhappy with her treatment and pay at the City.  (Day 2 at 263–67.)  Based on this evidence, the jury could have found that Plaintiff was

Given this contemporaneous evidence, the Court is suspect that any amount of testimony corroborating Plaintiff would have swayed the jury to rule in her favor.[23] *Cf. Volkman v. United Transp. Union*, 724 F. Supp. 1282, 1296 (D. Kan. 1989) ("Documents, especially if contemporaneous to events, are more probative than trial testimony eight years later."). But this is especially true here where the scope of the excluded testimony is minimal and was to be elicited from someone who is admittedly close friends with Plaintiff. (Day 3 at 8, 23.) Indeed, Plaintiff argues that had the jury heard her friend's answer to just three additional questions about Plaintiff's reaction at some unidentified time to receiving the August 2021 photo, they would have been swayed to rule in her favor. The Court simply cannot find that to be the case.

As an initial matter, this testimony was merely corroborative of other evidence presented by Plaintiff, meaning that its exclusion was not prejudicial to Plaintiff's ability to prove her case. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1218 (3d Cir. 1995) ("While it is true that the excluded testimony would have bolstered the speaker's credibility, we can not conclude that its exclusion was prejudicial to Lightolier's case. We are particularly hesitant to find prejudicial error when the admitted testimony was corroborative."); *Giedgowd*, 2021 WL 4963533, at *17 (finding no harmless error on hearsay ruling where the evidence was merely corroborative). And while the excluded testimony may have bolstered Plaintiff's credibility, significantly, Rodriguez already testified, without any hearsay objections, to Plaintiff's contemporaneous reaction to Rivera's comments at the September 2021 Latino Convention, testifying that Plaintiff said, "[t]his fucker. Who does he think he is?" and "why he will continue to do this to me." (*Id.* at 21–

---

attempting to utilize Rivera's conduct as leverage to keep and boost her position as human resources director and question her credibility.

[23] To this end, Court finds that even if Plaintiff had created a record demonstrating that she would have called Ramos but for the Court's hearsay ruling, such error was harmless given the weight of the evidence against Plaintiff, as described above.

22.)  Rodriguez also testified to the negative effect that Rivera's harassment has had on Plaintiff to date, stating that Plaintiff has been "[d]epressed," "[a]gitated," "[c]rying easily" and not the "cheerleader that she always was."  (*Id.* at 32–33.)  In other words, through this testimony, which is similar to what Rodriguez's began to testify to with respect to the August 2021 photo (Day 3 at 24), the jury already heard evidence corroborating Plaintiff's rendition of the facts as is relevant to the third component of hostile work environment.  But the jury chose to reject this testimony and the Court cannot find that the failure to answer three additional questions impacted the verdict.[24]

In sum, the Court finds it highly probable that Rodriguez's response to these handful of additional questions would not have overcome the evidence set forth by the City.[25]  *See*

---

[24] Plaintiff argues that the significance of the Court's error can be seen through the jury's question in which they asked the Court: "Question 1 mentions Aida specifically, but your instructions say to consider a reasonable woman.  Do we answer based on Aida specifically?"  (May 9, 2024 Trial Tr., Jury Notes at 3.)  The purpose of the jury's question here is at best ambiguous.  But even if the Court interpreted this question as signifying that the jury found for the City on the subjective component of the hostile work environment claim, for the reasons outlined above, the Court finds that Rodriguez's testimony would not have changed this conclusion.

[25] The cases Plaintiff relies on do not compel a different result.  In arguing that the Court's error was not harmless, Plaintiff cites *Glass v. Philadelphia Electric Co.*, 34 F.3d 188 (3d Cir. 1994) and *Quinn v. Consolidates Freightways Corp. of Delaware*, 283 F.3d 572 (3d Cir. 2002).  But both cases involved instances where the trial court impermissibly implemented blanket exclusions of critical evidence, leaving the plaintiffs with little recourse in proving their case.  In *Glass*, a case involving race discrimination in the form of refusing to hire the plaintiff for various positions, the trial court forbid the plaintiff from questioning witnesses about a hostile work environment the plaintiff faced at a previous location with the company, Eddystone, while permitting the defendant to offer testimony that the reason that he was not hired was his work performance at Eddystone.  34 F.3d at 190–92.  The Third Circuit held that by "repeatedly" sustaining objections on this ground, the trial court entirely prevented the plaintiff from rebutting the defendant's pretext argument and the error was therefore not harmless.  *Id.* at 193–95.  Then in *Quinn*, a case involving allegations of sexual harassment and discrimination, the trial court issued a "blanket exclusion" on evidence from the plaintiff's "key" witness as to harassment that she witnessed as a discovery sanction.  283 F.3d at 575–77.  The Third Circuit found this ruling inappropriate and refused to find it harmless because it prevented the plaintiff from presenting "critical evidence from which the jury could find that [the defendants] proffered reason for plaintiff's termination was pretextual."  *Id.* at 578–79.  In contrast to both cases, here, the Court did not issue a blanket exclusion to any evidence and instead ruled on specific hearsay objections raised by the City as to three of Plaintiff's counsel's questions.  (Day 3 at 24, 30–31.)  Nor did the Court entirely prevent Plaintiff from supporting an element of her case, as Plaintiff herself testified about her reaction to the August 2021 photo (*see, e.g.*, Day 2 at

*Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 667, 676 (3d Cir. 2002) ("Even if the District Court was wrong that the statements are not hearsay, the overall evidence . . . was sufficient to support the jury's verdict with or without these statements.").  Any purported error committed by the Court did not result in injustice and was therefore harmless.

## V.     Conclusion

For the reasons set forth above, the Court denies Plaintiff's motion for a new trial.  An appropriate order follows.

---

77, 83–84, 88–89, 94–95, 225, 248) and Rodriguez was permitted to testify to Plaintiff's reaction to other conduct committed by Rivera that Rodriguez contemporaneously witnessed (Day 3 at 21–22).  Thus, the Court finds both *Quinn* and *Glass* inapposite.

In addition, Plaintiff relies on these cases for the proposition that evidentiary rulings in discrimination cases are more heavily scrutinized because "plaintiffs face proof problems."  (Doc. No. 90 at 11.)  But the Third Circuit was specifically discussing a plaintiff's difficult task of "persuading the fact-finder to disbelieve an employer's account of his own [pretextual] motives."  *Quinn*, 283 F.3d at 578.  Here, where Plaintiff's burden is to show that she had an adverse reaction to harassment at issue, such concerns are less palpable.